T.C. Memo. 1996-398


UNITED STATES TAX COURT


BRUCE AND LOIS ZENKEL, ET AL.,[1] Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket Nos. 12091-89, 19760-89,     Filed August 27, 1996.
          24512-89, 10147-91.


     <u>Stuart A. Smith</u> and <u>David H. Schnabel</u>, for petitioners in

docket Nos. 12091-89, 24512-89, and 10147-91.

     <u>Stuart A. Smith</u>, <u>David H. Schnabel</u>, and <u>Richard J. Walsh</u>,

for petitioner in docket No. 19760-89.

     <u>Mitchell Hausman</u>, <u>Gail A. Campbell</u>, and <u>Frances Ferrito</u>

<u>Regan</u>, for respondent in docket No. 12091-89.

--------

     [1]     Cases of the following petitioners are consolidated for
opinion:  Bruce and Lois Zenkel, docket No. 12091-89; Robert G.
Blount, docket No. 19760-89; Morton and Carol David, docket No.
24512-89; and Ira and Helen Selvin, docket No. 10147-91.  The
cases were tried and briefed separately.

Gail A. Campbell and Frances Ferrito Regan, for respondent

in docket No. 19760-89.

Jennifer J. Kohler and Frances Ferrito Regan, for respondent

in docket No. 24512-89.

Wendy Sands and Frances Ferrito Regan, for respondent in

docket No. 10147-91.


CONTENTS

Page

MEMORANDUM FINDINGS OF FACT AND OPINION......................3
OPINION OF THE SPECIAL TRIAL JUDGE..........................3
FINDINGS OF FACT............................................6
  A. The Plastics Recycling Transactions......................6
  B. The Partnerships........................................9
  C. Richard Roberts.......................................12
  D. Stuart Becker and Steven Leicht.......................13
  E. Petitioners and Their Introduction to the Partnership
    Transactions.........................................17
    1. Bruce and Lois Zenkel.............................17
    2. Robert G. Blount..................................19
    3. Morton and Carol David............................22
    4. Ira and Helen Selvin..............................24
OPINION....................................................26
  A. Statute of Limitations.................................29
  B. Section 6653(a)--Negligence............................31
    1. The So-Called Oil Crisis..........................33
    2. Petitioners' Purported Reliance on Ta7
      Advisers.........................................37
      a. The Circumstances Under Which a Taxpayer May
        Avoid Liability Under Section 6653(a)(1) and
        (2) Because of Reasonable Reliance on
        Competent and Fully Informed Professional
        Advice.........................................40
      b. Becker........................................41
      c. Steele and Sprague............................48
    3. The Private Offering Memoranda....................51
    4. Miscellaneous.....................................55
    5. Conclusion as to Negligence.......................62
  C. Section 6659--Valuation Overstatement..................62
    1. The Grounds for Petitioners' Underpayments........64
    2. Concession of the Deficiency......................69
    3. Section 6659(e)...................................73

D. Petitioners' Motions For Leave To File Motion For
Decision Ordering Relief From the Negligence Penalty
and the Penalty Rate of Interest and To File Supporting
Memorandum of Law.......................................77

## MEMORANDUM FINDINGS OF FACT AND OPINION

DAWSON, Judge:  These cases were assigned to Special Trial Judge Norman H. Wolfe pursuant to the provisions of section 7443A(b)(4) and Rules 180, 181, and 183.  They were tried and briefed separately but consolidated for purposes of opinion.  All section references are to the Internal Revenue Code in effect for the tax years in issue, unless otherwise indicated.  All Rule references are to the Tax Court Rules of Practice and Procedure. The Court agrees with and adopts the opinion of the Special Trial Judge, which is set forth below.

## OPINION OF THE SPECIAL TRIAL JUDGE

WOLFE, Special Trial Judge:  These cases are part of the Plastics Recycling group of cases.  For a detailed discussion of the transactions involved in the Plastics Recycling cases, see Provizer v. Commissioner, T.C. Memo. 1992-177, affd. without published opinion 996 F.2d 1216 (6th Cir. 1993).  The facts of the underlying transactions and the Sentinel EPE recyclers in these cases are substantially identical to those in the Provizer case.

In notices of deficiency, respondent determined the following deficiencies in and additions to petitioners' Federal income taxes:

| | | | | | Penalty | | |
|---|---|---|---|---|---|---|---|
| Docket No. | Petitioner | Year | Deficiency | Sec. 6621(c) | Sec. 6653(a)(1) | Sec. 6653(a)(2) | Sec. 6659 |
| 12091-89 | Bruce and Lois Zenkel | 1979 | $26,330.00[1] | [2] | -- | -- | $7,899.00[4] |
| | | 1980 | 483.00[1] | -- | -- | -- | -- |
| | | 1982 | 72,349.00 | [2] | $3,617.00 | [3] | 21,705.00[4] |
| 19760-89 | Robert G. Blount | 1981 | 52,662.49 | [2] | 2,633.12 | [3] | 15,798.75 |
| 24512-89 | Morton and Carol David | 1982 | 51,356.00 | [2] | 2,569.00 | [3] | 15,407.00[4] |
| 10147-91 | Ira and Helen Selvin | 1981 | 44,626.00 | [2] | 2,231.00 | [3] | 13,388.00 |

[1]The deficiencies in docket No. 12091-89 for taxable years 1979 and 1980 result from disallowance of investment tax credit carrybacks and business energy credit carrybacks from taxable year 1982.

[2]Sec. 6621(c) was repealed by sec. 7721(b) of the Omnibus Budget Reconciliation Act of 1989 (OBRA 89), Pub. L. 101-239, 103 Stat. 2106, 2399, effective for tax returns due after Dec. 31, 1989, OBRA 89 sec. 7721(d), 103 Stat. 2400. The repeal does not affect the instant cases. The annual rate of interest under sec. 6621(c) for interest accruing after Dec. 31, 1984, equals 120 percent of the interest payable under sec. 6601 with respect to any substantial underpayment attributable to tax-motivated transactions.

[3]50 percent of the interest payable with respect to the portion of the underpayment attributable to negligence.

[4]In the alternative to the addition to tax under sec. 6659, respondent also determined that petitioners' underpayments were subject to the addition to tax under sec. 6661.

The parties in each of these consolidated cases filed a Stipulation of Settled Issues concerning the adjustments relating to their participation in the Plastics Recycling Program. Although there are insubstantial differences in the language used, such as singular terminology versus plural terminology, the stipulations are substantively identical. The stipulations in each of these consolidated cases provide, in part:

> 1. Petitioners are not entitled to any deductions, losses, investment credits, business energy investment credits or any other tax benefits claimed on their tax returns as a result of their participation in the Plastics Recycling Program.
>
> 2. The underpayments in income tax attributable to petitioners' participation in the Plastics Recycling Program are substantial underpayments attributable to tax-motivated transactions, subject to the increased rate of interest established under I.R.C. §6621(c), formerly §6621(d).
>
> 3. This stipulation resolves all issues that relate to the items claimed on petitioners' tax returns resulting from their participation in the Plastics Recycling Program, except for the petitioners' potential liability for additions to the tax for valuation overstatements under I.R.C. §6659 and for negligence under the applicable provisions of §6653(a).

Long after the trials in these cases, petitioners in docket Nos. 10147-91 (Selvin), 24512-89 (David), and 19760-89 (Blount) each filed a Motion For Leave to File Motion for Decision Ordering Relief From the Negligence Penalty and the Penalty Rate of Interest and to File Supporting Memorandum of Law under Rule 50. These motions were filed with attached exhibits on September 22, 1995, October 2, 1995, and November 30, 1995, respectively.

On those same dates, each petitioner who filed a motion for leave also lodged with the Court a motion for decision ordering relief from the additions to tax for negligence and the increased rate of interest, with attachments, and a memorandum in support of such motion. Subsequently, respondent filed objections, with attachments, and memoranda in support thereof. For reasons discussed in more detail at the end of this opinion, and also in Farrell v. Commissioner, T.C. Memo. 1996-295, petitioners' motions shall be denied.

The issues remaining in these consolidated cases are: (1) Whether the assessment in docket No. 24512-89 (David) is barred by the statute of limitations; (2) whether petitioners are liable for additions to tax under section 6653(a)(1) and (2) for negligence; and (3) whether petitioners are liable for additions to tax under section 6659 for underpayments of tax attributable to valuation overstatement.

FINDINGS OF FACT

Some of the facts have been stipulated in each case and are so found. The stipulated facts and attached exhibits are incorporated in the respective cases by this reference.

A. The Plastics Recycling Transactions

These cases concern petitioners' investments in four limited partnerships that leased Sentinel expanded polyethylene (EPE) recyclers: Phoenix Recycling Group (Phoenix), Scarborough Leasing Associates (Scarborough), SAB Resource Reclamation

Associates (SAB Reclamation), and SAB Resource Recycling Associates (SAB Recycling). Petitioners Zenkel are limited partners in SAB Reclamation; petitioner Blount is a limited partner in Phoenix; petitioners David are limited partners in SAB Recycling; and petitioners Selvin are limited partners in Scarborough. For convenience we refer to these partnerships collectively as the Partnerships.

The transactions involving the Sentinel EPE Recyclers leased by the Partnerships are substantially identical to those in the Clearwater Group limited partnership (Clearwater), the partnership considered in Provizer v. Commissioner, T.C. Memo. 1992-177. Petitioners have stipulated substantially the same facts concerning the underlying transactions as we found in the Provizer case.

In the Provizer case, Packaging Industries, Inc. (PI), manufactured and sold six Sentinel EPE recyclers to ECI Corp. for $981,000 each. ECI Corp., in turn, resold the recyclers to F & G Corp. for $1,162,666 each. F & G Corp. then leased the recyclers to Clearwater, which licensed the recyclers to FMEC Corp., which sublicensed them back to PI. The sales of the recyclers from PI to ECI Corp. were financed with nonrecourse notes. Approximately 7 percent of the sales price of the recyclers sold by ECI Corp. to F & G Corp. was paid in cash with the remainder financed through notes. These notes provided that 10 percent of the notes

were recourse but that the recourse portion of the notes was only due after the nonrecourse portion, 90 percent, was paid in full.

All of the monthly payments required among the entities in the above transactions offset each other. These transactions were done simultaneously. Although the recyclers were sold and leased for the above amounts under the structure of simultaneous transactions, the fair market value of a Sentinel EPE recycler in 1981 and 1982 was not in excess of $50,000.

PI allegedly sublicensed the recyclers to entities that would use them to recycle plastic scrap. The sublicense agreements provided that the end-users would transfer to PI 100 percent of the recycled scrap in exchange for a payment from FMEC Corp. based on the quality and amount of recycled scrap.

Like Clearwater, each of the Partnerships leased Sentinel EPE recyclers from F & G Corp. and licensed those recyclers to FMEC Corp. The transactions of the Partnerships differ from the underlying transactions in the Provizer case in the following respects: (1) The entity that leased the machines from F & G Corp. and licensed them to FMEC Corp., and (2) the number of recyclers the Partnerships were organized to lease and license. Phoenix, Scarborough, and SAB Recycling each was to lease and license seven Sentinel EPE recyclers. SAB Reclamation was to lease and license eight recyclers, according to its offering memorandum, but the SAB Reclamation partnership tax return for 1982 indicates that it leased and licensed only four recyclers.

For convenience, we refer to the series of transactions among PI, ECI Corp., F & G Corp., each of the Partnerships, FMEC Corp., and PI as the Partnership transactions. In addition to the Partnership transactions, a number of other limited partnerships entered into transactions similar to the Partnership transactions, also involving Sentinel EPE recyclers and Sentinel expanded polystyrene (EPS) recyclers. We refer to these collectively as the Plastics Recycling transactions.

B. The Partnerships

Phoenix and Scarborough are New York limited partnerships that were formed in late 1981. The general partner of Phoenix is Richard Roberts (Roberts). He and Samuel L. Winer (Winer) are the general partners of Scarborough. Winer is also the general partner of Clearwater, the partnership considered in the Provizer case. See Provizer v. Commissioner, supra.

SAB Reclamation and SAB Recycling are New York limited partnerships that were organized and promoted in 1982 by Stuart Becker (Becker), a certified public accountant (C.P.A.) and the founder and principal owner of Stuart Becker & Co., P.C. (Becker Co.), an accounting firm that specialized in tax matters. Becker organized a total of six recycling partnerships (the SAB Recycling Partnerships). Two of the SAB Recycling Partnerships closed in late 1981, two closed in early 1982 (SAB Reclamation and SAB Recycling), and two more closed in late 1982.

The general partner of each of the SAB Recycling Partnerships, including SAB Reclamation and SAB Recycling, is SAB Management Ltd. (SAB Management).  SAB Management is wholly owned by Scanbo Management Ltd. (Scanbo), which is wholly owned by Becker.  Scanbo is an acronym for three of Becker's children: Scott, Andy, and Bonnie.  The officers and directors of SAB Management and Scanbo are as follows:  (1) Becker, president and director; (2) Noel Tucker (Tucker), vice president, treasurer, and director; and (3) Steven Leicht (Leicht), vice president, secretary, and director.  During the years in issue, Tucker and Leicht also worked at Becker Co.  Tucker was vice president. Each owned between 5 and 7 percent of the stock of Becker Co. SAB Management did not engage in any business before becoming involved with the SAB Recycling Partnerships.

With respect to each of the Partnerships, a private placement memorandum was distributed to potential limited partners.  Reports by F & G Corp.'s evaluators, Dr. Stanley M. Ulanoff (Ulanoff), a marketing consultant, and Dr. Samuel Z. Burstein (Burstein), a mathematics professor, were appended to the offering memoranda.  Ulanoff owns a 1.27-percent interest in Plymouth Equipment Associates and a 4.37-percent interest in Taylor Recycling Associates, partnerships that leased Sentinel recyclers.  Burstein owns a 2.605-percent interest in Empire Associates and a 5.82-percent interest in Jefferson Recycling Associates, also partnerships that leased Sentinel recyclers.

Burstein also was a client and business associate of Elliot I. Miller (Miller), the corporate counsel to PI.

The offering memoranda for Phoenix, Scarborough, SAB Reclamation, and SAB Recycling state that the general partner will receive fees from those partnerships in the respective amounts of $40,000, $73,000, $110,000 and $97,375. SAB Management received fees of approximately $500,000 as the general partner of the SAB Recycling Partnerships. In addition, Becker Co. prepared the partnership returns and Forms K-1 for all of the SAB Recycling Partnerships and received fees for those services.

The offering memoranda also allocate a percentage of the proceeds from each offering--7.5 percent in the case of SAB Reclamation and SAB Recycling and 10 percent in the case of Phoenix and Scarborough--to the payment of sales commissions and offeree representative fees. In addition, the offering memoranda provide that the respective general partners "may retain as additional compensation all amounts not paid as sales commissions or offeree representative fees." However, neither SAB Management nor Becker retained or received any sales commissions or offeree representative fees. Instead, after the closing of each SAB Recycling Partnership, Becker rebated to each investor whose investment was not subject to a sales commission or offeree representative fee an amount equal to 7.5 percent of such investor's original investment.

The offering memoranda list significant business and tax risk factors associated with investments in the Partnerships. Specifically, the offering memoranda state: (1) There is a substantial likelihood of audit by the Internal Revenue Service (IRS) and the purchase price paid by F & G Corp. to ECI Corp. probably will be challenged as being in excess of fair market value; (2) the Partnerships have no prior operating history; (3) the general partner has no prior experience in marketing recycling or similar equipment; (4) the limited partners have no control over the conduct of the Partnerships' business; (5) there is no established market for the Sentinel EPE recyclers; (6) there are no assurances that market prices for virgin resin will remain at their current costs per pound or that the recycled pellets will be as marketable as virgin pellets; and (7) certain potential conflicts of interest exist.

C. Richard Roberts

Roberts is a businessman and the general partner in a number of limited partnerships that leased and licensed Sentinel EPE recyclers, including Phoenix and Scarborough. He also is a 9-percent shareholder in F & G Corp., the corporation that leased the recyclers to Phoenix and Scarborough. From 1982 through 1985, Roberts maintained the following office address with Raymond Grant (Grant), the sole owner and president of ECI Corp.:

                    Grant/Roberts
                    Investment Banking
                    Tax Sheltered Investments

745 Fifth Avenue, Suite 410
New York, New York  10022

Grant was instrumental in the hiring of Ulanoff as an evaluator of the Plastics Recycling transactions; the two had met on a cruise.  Roberts and Grant together have been general partners in other investments.

Prior to the Partnership transactions, Roberts and Grant were clients of the accounting firm H. W. Freedman & Co. (Freedman & Co.).  Harris W. Freedman (Freedman), the named partner in Freedman & Co., was the president and chairman of the board of F & G Corp.  He also owned 94 percent of a Sentinel EPE recycler.  Freedman & Co. prepared the partnership returns for ECI Corp., F & G Corp., Phoenix, and Scarborough.  It also provided tax services to John D. Bambara (Bambara).  Bambara is the 100-percent owner of FMEC Corp., as well as its president, treasurer, clerk, and director.  He, his wife, and daughter also owned directly or indirectly 100 percent of the stock of PI.

D.  Stuart Becker and Steven Leicht

Becker does not have an engineering background, and he is not an expert in plastics materials or plastics recycling.  He received a B.S. degree in accounting from New York University in 1964 and an M.B.A. in taxation from New York University School of Business Administration in 1973.  He passed the certified public accountancy test in 1967 and was the winner of the gold medal, awarded to the person achieving the highest score on the

examination for that year.  Since early 1966, Becker has practiced as a C.P.A. exclusively in the tax area.  From 1964 until 1972 he worked for the accounting firm of Touche, Ross & Co., and in 1972 he joined the accounting firm of Richard A. Eisner & Co. as the partner in charge of the tax department.  In 1977, Becker founded Becker Co.

Becker had considerable experience involving tax shelter transactions before he organized the SAB Recycling Partnerships. He prepared opinions regarding tax shelters' economic and tax projections, advised individuals and companies with respect to investments in tax shelters, lectured extensively about tax shelter investments generally, and lectured and published with respect to leveraged tax shelters.  Becker described a leveraged tax shelter as "a transaction where [the ratio of] the effective [tax] writeoff, which includes the value of the tax credit, * * * [to the amount invested] exceeds one to one."  Becker Co. specialized in tax-advantaged investments.  From 1980 to 1982, approximately 60 percent of the work done by Becker Co. involved tax sheltered and private investments.  Becker has owned minority interests in general partners of numerous limited partnerships. Prior to organizing the SAB Recycling Partnerships, Becker owned 5 percent of the general partner of partnerships involved in approximately 14 transactions concerning river transportation (such as barges, tow boats, and grain elevators).

Although investment counseling was related to his firm's line of business, Becker did not consider himself in the business of providing investment advice. Becker did not normally hire other professionals for consultation or advice. In circumstances where he believed there was a need for outside advice, he would so advise the client. Between 30 and 40 of Becker's clients invested in the Plastics Recycling partnerships.

Becker learned of the Plastics Recycling transactions when a prospective client presented him with an offering memorandum concerning the transactions in August or September 1981. Becker reviewed the offering memorandum and spoke to Miller, one of the key figures in the transactions and an acquaintance of Becker's. Miller was a shareholder of F & G Corp. and, as noted, the corporate counsel to PI. He also represented Grant and some of Grant's clients. Thereafter, Becker recommended the investment to the prospective client. Although the prospective client did not invest in the Plastics Recycling transactions, Becker became interested in the proposal and organized the SAB Recycling Partnerships in order to make similar investments in Sentinel EPE recyclers conveniently available to appropriate clients.

In organizing the SAB Recycling Partnerships, Becker was not allowed to change the format of the transactions or the purchase, lease, or licensing prices of the Sentinel EPE recyclers. He was allowed only to conduct a limited investigation of the proposed investments and choose whether or not to organize similar

partnerships.  Becker relied heavily upon the offering materials and discussions with persons involved in the matter to evaluate the Plastics Recycling transactions.  He and two other members of Becker Co., Leicht and Tucker, investigated PI and visited its plant in Hyannis, Massachusetts, where they saw the Sentinel EPE recyclers.  Tucker did not testify at any of the trials.

During his investigation of the Plastics Recycling transactions, Becker did not hire any plastics, engineering, or technical experts, or recommend that his clients do so.  Becker discussed the transactions with Michael Canno (Canno) of the Equitable Bag Co., a manufacturer of paper and plastic bags.  Canno never saw the recyclers or the pellets and never wrote any reports assessing the equipment or the pellets.  In addition, Becker retained a law firm, Rabin & Silverman, to assist him in organizing the SAB Recycling Partnerships.  See Spears v. Commissioner, T.C. Memo. 1996-341, to the effect that in employing the law firm, Becker particularly sought to protect himself against liability.

Leicht and Tucker also familiarized themselves with the Plastics Recycling transactions.  Leicht has a B.A. degree in finance and accounting from Penn State University, a J.D. from SUNY Buffalo, and an LL.M. in taxation from New York University School of Law.  Leicht ran a mathematical check on the numbers contained in the offering materials for Becker, but he did not test the underlying assumptions upon which they were based.  He

also visited PI in Hyannis and met with Miller and other insiders to the transactions.  Leicht never communicated an opinion as to the value of the recyclers other than what was presented in the offering memoranda.  He has no education or expertise in plastics materials or plastics recycling.

E.  Petitioners and Their Introduction to the Partnership Transactions

Petitioners in these cases under consideration do not have any education or work experience in plastics recycling or plastic materials.  They did not independently investigate the Sentinel EPE recyclers or see a Sentinel EPE recycler or any other type of plastics recycler prior to participating in the recycling ventures.

1.  Bruce and Lois Zenkel

Petitioners Bruce and Lois Zenkel (the Zenkels) resided in Scarsdale, New York, when their petition was filed.  Bruce Zenkel (Mr. Zenkel) graduated from the University of Michigan and took some post-graduate courses at the University of Pennsylvania.  Mr. Zenkel did not testify at trial.  Lois Zenkel (Mrs. Zenkel) attended Connecticut College and in 1975 received a degree from Manhattanville College.  During the years in issue, Mrs. Zenkel was a freelance photographer, and Mr. Zenkel was an investment banker.  On their joint 1982 Federal income tax return, the Zenkels reported gross income from wages, interest, dividends,

State and local tax refunds, capital gains, and other sources in excess of $300,000.

In 1982, Mrs. Zenkel acquired a 9-percent limited partnership interest in SAB Reclamation for a gross investment of $50,000, without taking into consideration any sales commission rebate or advance royalty distribution. Based on Mrs. Zenkel's interest in SAB Reclamation, on their 1982 Federal income tax return the Zenkels claimed an operating loss in the amount of $40,100 and investment tax and business energy credits totaling $83,712. Their total credits claimed, $85,547, were subject to a limitation of $62,841. The Zenkels carried back the unused portion of the credits to 1979 and 1980. Respondent disallowed the Zenkels' claimed operating loss and credits related to Mrs. Zenkel's investment in SAB Reclamation.

The Zenkels learned of the Plastics Recycling transactions and SAB Reclamation from Robert Steele (Steele), an accountant with Becker Co. At the time, Becker Co. prepared the Zenkels' Federal and State income tax returns. Mr. Zenkel had earlier met Steele and Becker on separate occasions during the mid-1970's. Mr. Zenkel initially met Becker in connection with some investment offerings with which Mr. Zenkel was involved. After Mrs. Zenkel also met Steele, the couple hired Becker Co. to handle their tax and related accounting needs.

Steele provided Mrs. Zenkel with a copy of the SAB Reclamation offering memorandum. Mrs. Zenkel looked it over and

discussed the investment with Mr. Zenkel.  She did not know whether Becker or Steele had any experience, education, or background in plastics recycling.  The Zenkels each talked to Steele about the investment.  Mr. Zenkel called Becker directly and asked him a large number of questions about the Plastics Recycling transactions.  Becker answered his questions and related the particulars of his investigation to Mr. Zenkel.  The Zenkels had extensive investment experience prior to investing in SAB Reclamation.  Mrs. Zenkel considered Mr. Zenkel, who had professional experience in the syndication business, to be sophisticated in financial matters.

2.  Robert G. Blount

Petitioner Robert G. Blount (Blount) resided in Southhampton, New York, when his petition was filed.  He received an undergraduate degree in accounting from Babson College in 1960 and joined the accounting firm of Arthur Andersen & Co. (Andersen) that same year.  Blount became a C.P.A. in 1965 and in 1970 he became a partner at Andersen.  In 1973 he left Andersen and became the chief financial officer of a small company and in 1974 he joined American Home Products (AHP), a major pharmaceutical manufacturer, as its treasurer and vice president of finance, subsequently advancing to positions of greater responsibility with AHP.  On his 1981 Federal income tax return, Blount reported gross income from wages in excess of $332,000.

Blount acquired a 2.605-percent interest in Phoenix for a gross investment of $25,000 in 1981, without taking into consideration any sales commission rebate or advance royalty distribution. As a result of his investment in Phoenix, on his 1981 Federal income tax return Blount claimed an operating loss in the amount of $20,520 and investment tax and business energy credits totaling $42,402. Respondent disallowed Blount's claimed operating loss and credits related to his investment in Phoenix.

Blount learned of the Plastics Recycling transactions and Phoenix in 1981 from William Sprague (Sprague), a former colleague at Andersen who had been introduced to the transactions by Leicht. Sprague joined Andersen in 1935, became a C.P.A. in 1938 (receiving the silver medal for the second highest grade on the examination), and had been a partner at Andersen for approximately 20 years when he retired in 1973. His work at Andersen was primarily in the area of auditing and administrative functions within the firm. Sprague knew Leicht because the latter also worked for Andersen, specifically from 1974 through 1980, and the two occasionally had lunch together. Leicht was working at Becker Co. in late 1981 when he suggested to Sprague that he look at some of the potential investments that passed through Becker Co. Sprague was familiar with Becker Co., and he knew Becker personally since both had been involved with the New York State Society of C.P.A.'s.

Leicht gave Sprague a copy of the Phoenix offering memorandum, and he reviewed it over a couple of days.  Sprague was a complete stranger to the idea of plastics recycling and was incapable of evaluating the technical or engineering details associated with the investment.  Thereafter, he discussed the investment with Leicht, and Leicht described his visits to PI. Becker stated that he too discussed the investment with Sprague and disclosed the extent of his investigation; Sprague, however, could not recall their conversation.  Sprague did not otherwise investigate the Plastics Recycling transactions; he relied exclusively on the offering materials and Becker Co.

During this time, Sprague saw Blount on business occasions and also lunched with him about once a month.  At one such lunch, the two were discussing investment opportunities when Blount mentioned that he was going to receive additional compensation income.  Sprague suggested the Plastics Recycling transactions as a potential investment and in general terms recounted the information he had received from Leicht.  He explained that as a service to clients, Becker Co. screens such investments--not to guarantee them--but to determine generally if the proposed investments are something their clients should look into. Sprague suggested that Blount contact Leicht or Becker, but Blount never spoke to either of them.  Blount simply reviewed the offering memorandum for a few hours and gave it to his tax preparer, Marilyn Gowin (Gowin).  Gowin reviewed all supporting

documents for any transactions appearing on Blount's tax returns. Blount considered Phoenix to be a high-risk investment.

### 3. Morton and Carol David

Petitioners Morton and Carol David (the Davids) resided in New York, New York, when their petition was filed. Morton David (David) received a B.A. degree from City College of New York in 1956 and a J.D. from Harvard Law School in 1961. From 1961 through 1963, David was an assistant to the special trial counsel of the American Stock Exchange. He then practiced corporate law at the law firm of Cooper, Ostrand, Devarco & Ackerman from 1963 until 1967. David has not practiced law since then. Instead, David has engaged in the business of workouts and turnarounds of technology companies, including a small cable television company, a burglar alarm company, a military contracting company, an electronics company, and a computer company. On their joint 1982 Federal income tax return, the Davids reported gross income from wages, interest, dividends, State and local tax refunds, and capital gains in excess of $750,000.

David acquired a 2.538461-percent interest in SAB Recycling for a gross investment of $25,000 in 1982, without taking into consideration any sales commission rebate or advance royalty distribution. As a result of his interest in SAB Recycling, on their joint 1982 Federal income tax return the Davids claimed an operating loss in the amount of $19,871 and investment tax and business energy credits totaling $41,320. Respondent disallowed

the Davids' claimed operating loss and credits related to SAB Recycling.

David learned of the Plastics Recycling transactions and SAB Recycling from Becker in late 1981 or 1982. He first met Becker sometime in 1963 when David was general counsel for Perfect Photo Co. (PPC) and Becker did tax work for PPC on behalf of Touche, Ross & Co. From 1968 until 1984, Becker provided David with personal tax advice and performed tax accounting work for companies that David controlled. David spent 4 to 6 hours reviewing the offering memorandum for SAB Recycling and thereafter he discussed the investment with Becker. Becker described his investigation of the Plastics Recycling transaction to David in detail.

David has no education or experience in plastics materials or plastics recycling, and he knew that Becker was not an expert in the plastics industry. He did not discuss the investment with anyone who was knowledgeable or expert in the plastics industry. He never viewed a recycler or independently investigated PI. David did not investigate whether there was a market for recycled pellets or independently verify any of the representations in the offering memorandum. He simply reviewed the SAB Recycling offering memorandum and discussed the proposed investment with Becker.

4.  Ira and Helen Selvin

Petitioners Ira and Helen Selvin (the Selvins) resided in Roslyn Estates, New York, when their petition was filed.  Ira Selvin (Selvin) received a B.S. degree from New York University School of Commerce.  Excluding his active service in the U.S. Army during World Wars I and II, Selvin has practiced accounting for his entire career until he retired in approximately 1980.  He was a sole practitioner for 30-35 years and serviced many clients in the garment industry.  Selvin eventually turned his practice over to the accounting firm of Cooper, Selvin & Strasburg.  Although it maintained an office for him, Selvin never actively worked for that firm.  On their joint 1981 Federal income tax return, the Selvins reported gross income from interest, dividends, capital gains, pensions or annuities, and other sources in excess of $172,000.

In 1981 Selvin acquired an interest in Scarborough as a nominee on behalf of himself and other members of his accounting firm (hereinafter "the Selvin group").  The Selvin group invested $180,000 for an 18.27-percent interest in Scarborough.  The amount of Selvin's share in Scarborough is not entirely clear from the record in docket No. 10147-91.  Selvin stated that he invested $30,000 in Scarborough, which is the equivalent of a 3.05-percent interest (30,000/180,000 = 16.67 percent; .1667 x .1827 = 3.05 percent).  However, the Selvins claimed $44,626 of

investment tax and business energy credits using a reported basis in qualifying property of $223,126. That amount is 15 percent of the total basis owned by the Selvin group (223,126/1,487,504 = .15), which is the equivalent of an investment of only $27,000 (180,000 x .15 = $27,000) and a total interest in Scarborough of 2.74 percent (.18277 x .15 = .0274). Relying on the documentary evidence, we find that the Selvins paid $27,000 for their partnership interest in Scarborough.

As reported on Selvin's 1981 Form K-1 from Scarborough, the Selvin group's share of Scarborough's operating loss equaled $142,821, and its share of Scarborough's basis in the recyclers was $1,487,504. The Selvins did not claim any portion of the operating loss on their joint 1981 Federal income tax return but, as noted, they did claim investment tax and business energy credits totaling $44,626. Respondent disallowed these claimed credits.

Selvin learned of the Plastics Recycling transactions and Scarborough from Becker. He first met Becker on a trip to Israel in approximately 1968 and the two have been friendly ever since. Selvin has never referred a client to Becker, although on one occasion Becker referred a client to Selvin. Becker gave Selvin a copy of the Scarborough offering memorandum. Selvin spent several hours reviewing the offering memorandum and discussed it with Becker. Becker answered Selvin's questions and explained

the full extent of his investigation, such as his visit to PI, speaking with Canno, and his research of trade journals to confirm the price of plastic pellets.  Becker never represented that he was an expert in plastics materials or plastics recycling.  Selvin did not do any independent investigation of the Sentinel EPE recyclers or plastics recycling in general.  He invested in Scarborough based solely on his review of the offering materials and his discussions with Becker.

After the 1981 SAB Recycling Partnerships closed, Becker paid Selvin's accounting firm to send an accountant to PI to confirm, by serial number, that as of December 31, 1981, the equipment that was leased to the 1981 SAB Recycling Partnerships was indeed available for use.  Becker arranged for this verification, independent of PI, because he understood that the investment tax and business energy credits would not be available if the qualifying property was not available for use.

### OPINION

We have decided more than 30 of the Plastics Recycling group of cases.[2]  The majority of these cases, like the consolidated

---

[2]      Provizer v. Commissioner, T.C. Memo. 1992-177, affd. without published opinion 996 F.2d 1216 (6th Cir. 1993), concerned the substance of the partnership transaction and also the additions to tax.
    The following cases concerned the addition to tax for negligence, inter alia:  Estate of Busch v. Commissioner, T.C. Memo. 1996-342; Spears v. Commissioner, T.C. Memo. 1996-341; Stone v. Commissioner, T.C. Memo. 1996-230; Reimann v.
(continued...)

cases herein, raised issues regarding additions to tax for negligence and valuation overstatement.  We have found the taxpayers liable for such additions to tax in all but one of the opinions to date on these issues, although procedural rulings have involved many more favorable results for taxpayers.[3]

---

[2](...continued)
Commissioner, T.C. Memo. 1996-84; Bennett v. Commissioner, T.C. Memo. 1996-14; Atkind v. Commissioner, T.C. Memo. 1995-582; Triemstra v. Commissioner, T.C. Memo. 1995-581; Pace v. Commissioner, T.C. Memo. 1995-580; Dworkin v. Commissioner, T.C. Memo. 1995-533; Wilson v Commissioner, T.C. Memo. 1995-525; Avellini v. Commissioner, T.C. Memo. 1995-489; Paulson v. Commissioner, T.C. Memo. 1995-387; Zidanich v. Commissioner, T.C. Memo. 1995-382; Ramesh v. Commissioner, T.C. Memo. 1995-346; Reister v. Commissioner, T.C. Memo. 1995-305; Fralich v. Commissioner, T.C. Memo. 1995-257; Shapiro v. Commissioner, T.C. Memo. 1995-224; Pierce v. Commissioner, T.C. Memo. 1995-223; Fine v. Commissioner, T.C. Memo. 1995-222; Pearlman v. Commissioner, T.C. Memo. 1995-182; Kott v. Commissioner, T.C. Memo. 1995-181; Eisenberg v. Commissioner, T.C. Memo. 1995-180.
    Greene v. Commissioner, 88 T.C. 376 (1987), concerned the applicability of the safe-harbor leasing provisions of sec. 168(f)(8).  Trost v. Commissioner, 95 T.C. 560 (1990), concerned a jurisdictional issue.
    Farrell v. Commissioner, T.C. Memo. 1996-295; Baratelli v. Commissioner, T.C. Memo. 1994-484; Estate of Satin v. Commissioner, T.C. Memo. 1994-435; Fisher v. Commissioner, T.C. Memo. 1994-434; Foam Recycling Associates v. Commissioner, T.C. Memo. 1992-645; Madison Recycling Associates v. Commissioner, T.C. Memo. 1992-605, concerned other issues.

    [3]    In Zidanich v. Commissioner, T.C. Memo. 1995-382, we held the taxpayers liable for the sec. 6659 addition to tax, but not liable for the negligence additions to tax under sec. 6653(a).  As indicated in our opinion, the Zidanich case, and the Steinberg case consolidated with it for opinion, involved exceptional circumstances.
    In Estate of Satin v. Commissioner, supra, and Fisher v. Commissioner, supra, after the decision in Provizer v. Commissioner, supra, the taxpayers were allowed to elect to accept a beneficial settlement because of exceptional

(continued...)

In <u>Provizer v. Commissioner</u>, T.C. Memo. 1992-177, a test case for the Plastics Recycling group of cases, this Court (1) found that each Sentinel EPE recycler had a fair market value not in excess of $50,000, (2) held that the transaction, which is almost identical to the Partnership transactions in these consolidated cases, was a sham because it lacked economic substance and a business purpose, (3) upheld the section 6659 addition to tax for valuation overstatement since the underpayment of taxes was directly related to the overstatement of the value of the Sentinel EPE recyclers, and (4) held that losses and credits claimed with respect to Clearwater were attributable to tax-motivated transactions within the meaning of section 6621(c).  In reaching the conclusion that the transaction lacked economic substance and a business purpose, this Court relied heavily upon the overvaluation of the Sentinel EPE recyclers.

Although petitioners have not agreed to be bound by the <u>Provizer</u> opinion, they have stipulated that the investments in the Sentinel EPE recyclers in these cases are similar to the investment described in <u>Provizer v. Commissioner</u>, <u>supra</u>.  The

---

³(...continued)
circumstances.  In <u>Farrell v. Commissioner</u>, <u>supra</u>, we rejected taxpayers' claim to a similar belated settlement arrangement since the circumstances were different and taxpayers previously had rejected settlement and elected to litigate the case.  See also <u>Baratelli v. Commissioner</u>, <u>supra</u>.

underlying transactions in these consolidated cases, and the Sentinel EPE recyclers considered in these cases, are the same type of transaction and same type of machines considered in Provizer v. Commissioner, supra.

Based on the entire records in these cases, including the extensive stipulations, testimony of respondent's experts, and petitioners' testimony, we hold that each of the Partnership transactions herein was a sham and lacked economic substance. In reaching this conclusion, we rely heavily upon the overvaluation of the Sentinel EPE recyclers. Respondent is sustained on the question of the underlying deficiencies. We note that petitioners have explicitly conceded this issue in the respective stipulations of settled issues filed shortly before trial. The record plainly supports respondent's determination regardless of such concessions. For a detailed discussion of the facts and the applicable law in a substantially identical case, see Provizer v. Commissioner, supra.

A. Statute of Limitations

In their petition, the Davids alleged that the notice of deficiency in docket No. 24512-89 was not issued within the statutory limitations period. This issue appears to have been abandoned. The Stipulation of Settled Issues in docket No. 24512-89 indicates that the only issues remaining for decision in that case are the potential liability of the Davids for additions

to tax under sections 6653(a) and 6659.  None of the trial memoranda or briefs in docket No. 24512-89 address this issue.

Regardless of whether the issue was abandoned, the record in docket No. 24512-89 shows that the notice of deficiency in that case was issued within the statutory limitations period.  In general, section 6501(a) requires assessment of tax to be made within 3 years after a return is filed, whether the return was filed on or after the date prescribed.  Section 6501(b)(1) provides that if a return is filed before the due date, for purposes of section 6501, the return shall be considered filed on the due date.  Section 6501(c)(4) provides that if, before the expiration of the time to assess the tax under section 6501(a), the parties consent in writing to extend the time for the assessment of the tax, the tax may be assessed at any time before the end of the period agreed upon.

The Davids' joint 1982 Federal income tax return was due on April 15, 1983, and was filed on or before that date.  Therefore, the 3-year period of limitations under section 6501(a) initially was set to expire on April 15, 1986.  However, the Davids and respondent executed three consecutive Forms 872, Consent to Extend the Time to Assess Tax.  The first of these Forms 872 was fully executed on March 21, 1986, prior to expiration of the normal 3-year period of limitations, and the last of these Forms 872 extended the period of limitations to December 31, 1989.  The

notice of deficiency was mailed on July 21, 1989, well before the expiration of the extended limitations period.  The Davids have presented no evidence that the Forms 872 were not properly executed.  Accordingly, the notice of deficiency in docket No. 24512-89 was issued within the statutory limitations period, as extended by the parties, and the assessment in docket No. 24512-89 is not barred by the statute of limitations.

We note that in their respective petitions, the Selvins and the Zenkels also claimed that the notices of deficiency issued in their cases were barred by the statute of limitations.  However, the Selvins conceded the issue at a call of the calendar on March 21, 1994, and the Zenkels conceded the issue in the stipulation of facts filed in their case.  Blount never raised a statute of limitations issue.

B.  Section 6653(a)--Negligence

Respondent determined that petitioners are liable for additions to tax for negligence under section 6653(a)(1) and (2).  Petitioners have the burden of proving that respondent's determinations of these additions to tax are erroneous.  Rule 142(a); Luman v. Commissioner, 79 T.C. 846, 860-861 (1982).

Section 6653(a)(1) imposes an addition to tax equal to 5 percent of the underpayment if any part of an underpayment of tax is due to negligence or intentional disregard of rules or regulations.  Section 6653(a)(2) imposes an addition to tax equal

to 50 percent of the interest payable with respect to the portion of the underpayment attributable to negligence or intentional disregard of rules or regulations.

Negligence is defined as the failure to exercise the due care that a reasonable and ordinarily prudent person would employ under the circumstances. Neely v. Commissioner, 85 T.C. 934, 947 (1985). The question is whether a particular taxpayer's actions in connection with the transactions were reasonable in light of his experience and the nature of the investment or business. See Henry Schwartz Corp. v. Commissioner, 60 T.C. 728, 740 (1973). When considering the negligence addition to tax, we evaluate the particular facts of each case, judging the relative sophistication of the taxpayers, as well as the manner in which they approached their investment. McPike v. Commissioner, T.C. Memo. 1996-46. Compare, e.g., Spears v. Commissioner, T.C. Memo. 1996-341, with Zidanich v. Commissioner, T.C. Memo. 1995-382.

When petitioners invested in the partnerships, they had no education or experience in plastics materials or plastics recycling, nor had any of them seen a Sentinel EPE recycler. In each of these consolidated cases, petitioners maintain that they were reasonable in claiming deductions and investment credits with respect to their investments in the Partnerships. In support of such contentions, petitioners argue, in general terms: (1) That claiming the deductions and credits with respect to the

Partnerships was reasonable in light of the so-called oil crisis during the years in issue; and (2) that they reasonably relied upon the offering materials and a qualified adviser.

1.  The So-Called Oil Crisis

Petitioners argue that they reasonably expected to make an economic profit from the Partnership transactions because plastic is an oil derivative and the United States was experiencing a so-called oil crisis during the years 1981 and 1982.

Petitioners' contention that they reasonably expected an economic profit from the Partnership transactions is unconvincing.  Petitioners did not give due consideration to the caveats and warnings contained in the offering memoranda, nor seriously investigate or educate themselves in the Plastics Recycling transactions.  Moreover, testimony by one of respondent's experts establishes that the oil pricing changes during the late 1970's and early 1980's did not justify petitioners' claiming excessive investment credits and purported losses based on vastly exaggerated valuations of recycling machinery.

Petitioners' claim that they reasonably expected an economic profit from the Partnership transactions is undermined by their indifference to the warnings in the offering memoranda and their lack of knowledge regarding the transactions in general, notwithstanding the so-called oil crisis.  Mrs. Zenkel did not

know how many recyclers SAB Reclamation leased or who manufactured the recyclers. Blount had no idea who the general partner of Phoenix was, how a Sentinel EPE recycler worked, the value placed on the recyclers, how many recyclers Phoenix leased, or how he was going to make a profit from his investment. David did not know how many recyclers SAB Recycling purchased or the price of each machine. Selvin knew nothing about resin prices, was not aware of any companies that would be suitable end-users, and did not know whether Scarborough had any assets, or how the venture was to work.

Petitioners failed to explain how the so-called oil crisis, or the media coverage of it, provided a reasonable basis for them to invest in the Partnerships and claim the associated tax deductions and credits. The offering materials warned that there could be no assurances that prices for new resin pellets would remain at their then current level. One of respondent's experts, Steven Grossman, explained that the price of plastics materials is not directly proportional to the price of oil. In his report, he stated that less than 10 percent of crude oil is utilized for making plastics materials, and that studies have shown that "a 300% increase in crude oil prices results in only a 30 to 40% increase in the cost of plastics products." Moreover, during 1980 and 1981, in addition to the media coverage of the so-called oil crisis, there was "extensive continuing press coverage of

questionable tax shelter plans." Zmuda v. Commissioner, 731 F.2d 1417, 1422 (9th Cir. 1984), affg. 79 T.C. 714 (1982).

Petitioners' reliance on Krause v. Commissioner, 99 T.C. 132 (1992), affd. sub nom. Hildebrand v. Commissioner, 28 F.3d 1024 (10th Cir. 1994) and Rousseau v. United States, 71A AFTR 2d 93-4294, 91-1 USTC par. 50,252 (E.D. La. 1991), is misplaced. The facts in Krause v. Commissioner, supra, are distinctly different from the facts of these cases. In the Krause case, the taxpayers invested in limited partnerships whose investment objectives concerned enhanced oil recovery (EOR) technology. The Krause opinion states that during the late 1970's and early 1980's, the Federal Government adopted specific programs to aid research and development of EOR technology. In holding that the taxpayers in the Krause case were not liable for the negligence additions to tax, this Court noted that one of the Government's expert witnesses acknowledged that "investors may have been significantly and reasonably influenced by the energy price hysteria that existed in the late 1970's and early 1980's to invest in EOR technology." Id. at 177. In the present cases, however, as explained by respondent's expert Steven Grossman, the price of plastics materials was not directly proportional to the price of oil, and there is no persuasive evidence that the so-called oil crisis had a substantial bearing on petitioners' decisions to invest. While EOR was, according to our Krause

opinion, in the forefront of national policy and the media during the late 1970's and 1980's, there is no showing in these records that the so-called energy crisis would provide a reasonable basis for petitioners' investing in recycling of polyethylene, particularly in the machinery here in question.

Moreover, the taxpayers in the Krause opinion were experienced in or investigated the oil industry and EOR technology specifically.  One of the taxpayers in the Krause case undertook significant investigation of the proposed investment including researching EOR technology.  The other taxpayer was a geological and mining engineer whose work included research of oil recovery methods and who hired an independent geologic engineer to review the offering materials.  Id. at 166.  In the present cases, petitioners were not experienced or educated in plastics recycling or plastics materials.  They did not independently investigate the Sentinel recyclers or hire an expert in plastics to evaluate the Partnership transactions.

In Rousseau v. United States, supra, the property underlying the investment, ethanol producing equipment, was widely considered at that time to be a viable fuel alternative to oil, and its potential for profit was apparent.  In addition, the taxpayer therein conducted an independent investigation of the investment and researched the market for the sale of ethanol in the United States.  In contrast, as we noted in distinguishing

the <u>Krause</u> case, there is no showing in these records that the so-called oil crisis would provide a reasonable basis for petitioners' investing in the polyethylene recyclers here in question. As noted above, petitioners did not independently investigate the Sentinel EPE recyclers or hire an expert in plastics to evaluate the Partnership transactions. The facts of petitioners' cases are distinctly different from the <u>Rousseau</u> case. Accordingly, we do not consider petitioners' arguments with respect to the <u>Krause</u> and <u>Rousseau</u> cases applicable.

### 2. Petitioners' Purported Reliance on Tax Advisers

Petitioners also maintain that they reasonably relied upon the advice of a qualified adviser. The Zenkels discussed the investment with Steele and Becker; Blount discussed it with Sprague; and the Davids and the Selvins discussed it with Becker.

The concept of negligence and the argument of reliance on an expert are highly fact intensive. Petitioners in these cases are very well educated professionals whose intellect and business sophistication are reflected in their financial and business success. Blount is a C.P.A. and business executive with 13 years of accounting experience with Arthur Andersen, 3 of those as a partner, and employment with American Home Products, a major pharmaceutical company, initially as vice president of finance and treasurer in 1974, and subsequently in positions of greater responsibility. David was a corporate attorney before engaging

in workouts and turnarounds of technology companies.  Selvin is a
C.P.A. who ran his own accounting firm for 30 to 35 years in New
York City.  In respect of these accomplishments and their obvious
financial prowess, petitioners Blount, David, and Selvin do not
pretend to be unsophisticated investors.

Mrs. Zenkel, on the other hand, claims that she is an
unsophisticated investor.  Her claim is without merit.  In her
SAB Reclamation subscription agreement, Mrs. Zenkel expressly
represented and warranted that she had the experience and
expertise in financial and business affairs necessary to evaluate
the merits and risks of investing in SAB Reclamation.  Moreover,
her decision to invest in SAB Reclamation was made with the
assistance of Mr. Zenkel, an investment banker with experience in
the syndication business.  Although Mr. Zenkel did not testify at
the trial[4], the record shows that he discussed SAB Reclamation
with his wife, Steele, and Becker.  Becker testified that Mr.
Zenkel "called me directly regarding the program.  He had a large

---

[4]     Mr. and Mrs. Zenkel both benefited from the tax
deductions and credits from SAB Reclamation on their joint 1982
Federal Income tax return, and together they petitioned this
Court in docket No. 12091-89.  The testimony of Mrs. Zenkel and
Becker shows that Mr. Zenkel was heavily involved in the decision
to invest in SAB Reclamation, and his failure to testify does not
further his wife's claim that she was an unsophisticated
investor.  See Bresler v. Commissioner, 65 T.C. 182, 188 (1975);
Pollack v. Commissioner, 47 T.C. 92, 108 (1966), affd. 392 F.2d
409 (5th Cir. 1968); Wichita Terminal Elevator Co. v.
Commissioner, 6 T.C. 1158, 1165 (1946), affd. 162 F.2d 513 (10th
Cir. 1947).

number of questions which I answered for him, and apparently based on that he made his decision to invest." (Emphasis added.) The Zenkels are not unsophisticated investors. On their 1982 return, they reported dividend income in the amount of $146,644 and net long-term capital gains in the amount of $155,144.

Petitioners assert that they relied upon one or more members of the accounting firm of Becker Co., and in particular on its founder and principal owner Stuart Becker, to investigate the tax law and the underlying business circumstances of a proposed investment. In the Blount case, petitioner placed reliance on this firm only indirectly or secondhand, through Sprague. Becker, who is experienced in tax matters, explains that he made an investigation within the limits of his resources and abilities and fully disclosed what he had done. The question here is whether petitioners actually and reasonably relied on the accountant with respect to valuation problems requiring expertise in engineering and plastics technology or whether the accountant gave the tax advice and facilitated the transaction, but did not make a full and independent investigation of the relevant business and technology, and did clearly inform his clients of the limits of his knowledge and investigation of the transaction. For reasons set forth below, we believe the latter statement more accurately describes what happened here.

### a. The Circumstances Under Which a Taxpayer May Avoid Liability Under Section 6653(a)(1)

### and (2) Because of Reasonable Reliance on Competent and Fully Informed Professional Advice

A taxpayer may avoid liability for the additions to tax under section 6653(a)(1) and (2) if he or she reasonably relied on competent professional advice.  <u>United States v. Boyle</u>, 469 U.S. 241, 250-251 (1985); <u>Freytag v. Commissioner</u>, 89 T.C. 849, 888 (1987), affd. 904 F.2d 1011 (5th Cir. 1990), affd. 501 U.S. 868 (1991).  Reliance on professional advice, standing alone, is not an absolute defense to negligence, but rather a factor to be considered.  For reliance on professional advice to excuse a taxpayer from the negligence additions to tax, the taxpayer must show that such professional had the expertise and knowledge of the pertinent facts to provide informed advice on the subject matter.  <u>David v. Commissioner</u>, 43 F.3d  788, 789-790 (2d Cir. 1995), affg. T.C. Memo. 1993-621; <u>Goldman v. Commissioner</u>, 39 F.3d 402 (2d Cir. 1994), affg. T.C. Memo. 1993-480; <u>Freytag v. Commissioner</u>, <u>supra</u>; <u>Sacks v. Commissioner</u>, T.C. Memo. 1994-217, affd. 82 F.3d 918 (9th Cir. 1996); <u>Kozlowski v. Commissioner</u>, T.C. Memo. 1993-430, affd. without published opinion 70 F.3d 1279 (9th Cir. 1995); see also <u>Stone v. Commissioner</u>, T.C. Memo. 1996-230; <u>Reimann v. Commissioner</u>, T.C. Memo. 1996-84.

Reliance on representations by insiders, promoters, or offering materials has been held an inadequate defense to negligence.  <u>Goldman v. Commissioner</u>, <u>supra</u>; <u>Pasternak v.</u>

Commissioner, 990 F.2d 893 (6th Cir. 1993), affg. Donahue v. Commissioner, T.C. Memo. 1991-181; LaVerne v. Commissioner, 94 T.C. 637, 652-653 (1990), affd. without published opinion 956 F.2d 274 (9th Cir. 1992), affd. without published opinion sub nom. Cowles v. Commissioner, 949 F.2d 401 (10th Cir. 1991); Marine v. Commissioner, 92 T.C. 958, 992-993 (1989), affd. without published opinion 921 F.2d 280 (9th Cir. 1991); McCrary v. Commissioner, 92 T.C. 827, 850 (1989); Rybak v. Commissioner, 91 T.C. 524, 565 (1988).  Pleas of reliance have been rejected when neither the taxpayer nor the advisers purportedly relied upon by the taxpayer knew anything about the nontax business aspects of the contemplated venture.  David v. Commissioner, supra; Goldman v. Commissioner, supra; Freytag v. Commissioner, supra; Beck v. Commissioner, 85 T.C. 557 (1985); Lax v. Commissioner, T.C. Memo. 1994-329, affd. without published opinion 72 F.3d 123 (3d Cir. 1995); Sacks v. Commissioner, supra; Steerman v. Commissioner, T.C. Memo. 1993-447; Rogers v. Commissioner, T.C. Memo. 1990-619; see also the Plastics Recycling cases cited, supra note 2.

### b.  Becker

Becker had no education, special qualifications, or professional skills in plastics engineering, plastics recycling, or plastics materials.  In evaluating the Plastics Recycling transactions and organizing the SAB Recycling Partnerships,

Becker supposedly relied upon: (1) The offering materials; (2) a tour of the PI facility in Hyannis; (3) discussions with insiders to the transactions; (4) Canno; and (5) his investigation of the reputation and background of PI and persons involved in the transactions.

Despite his lack of knowledge regarding the product, the target market, and the technical aspects at the heart of the Plastics Recycling transactions, Becker did not hire an expert in plastics materials or plastics recycling, or recommend that his clients do so. The only independent person having any connection with the plastics industry with whom Becker spoke was Canno. A client of Becker Co., Canno was a part owner and the production manager of Equitable Bag Co., a manufacturer of paper and plastic bags. Becker spoke to Canno about the recyclers and PI, but did not hire or pay him for any advice. Canno did not visit PI's plant in Hyannis, see or test a Sentinel EPE recycler, or see or test any of the output from a Sentinel EPE recycler or the recycled resin pellets after they were further processed by PI. According to Becker, Canno endorsed the Partnership transactions after reviewing the offering materials. Asked at trial if Canno had done any type of comparables analysis, Becker replied, "I don't know what Mr. Canno did."

Becker visited the PI plant in Hyannis, toured the facility, viewed a Sentinel EPE recycler in operation, and saw products

that were produced from recycled plastic. He claims that during his visit he was told that the recycler was unique and that it was the only machine of its type. In fact, the Sentinel EPE recycler was not unique; instead, several machines capable of densifying low density materials already were on the market. Other plastics recycling machines available during 1981 ranged in price from $20,000 to $200,000, including the Foremost Densilator, Nelmor/Weiss Densification System (Regenolux), Buss-Condux Plastcompactor, and Cumberland Granulator. See Provizer v. Commissioner, T.C. Memo. 1992-177.

Becker was also told that PI had put an enormous amount of research and development--10 to 12 years' worth--into the creation and production of the Sentinel EPE recycler. When he asked to see the cost records for some kind of independent verification, however, his request was denied. Becker was informed that such information was proprietary and secret, and that he would just have to take PI's representations as true. Although PI claimed that all of its information was a trade secret, and that it never obtained patents on any of its machines, PI had in fact obtained numerous patents prior to the recycling transactions and had also applied for a trademark for the Sentinel recyclers. Becker decided to accept PI's representations after speaking with Miller (the corporate counsel to PI), Canno (who had never been to PI's plant or seen a

Sentinel EPE recycler), and a surrogate judge from Rhode Island who did business in the Boston-Cape Cod area (and who had no expertise in engineering or plastics materials). Becker testified that he was allowed to see PI's internal accounting controls regarding the allocation of royalty payments and PI's recordkeeping system in general. In Provizer v. Commissioner, supra, this Court found that "PI had no cost accounting system or records."

Becker confirmed at trial that he relied on the offering materials and discussions with PI personnel to establish the value and purported uniqueness of the recyclers. Becker testified that he relied upon the reports of Ulanoff and Burstein contained in the offering materials, despite the fact that: (1) Ulanoff's report did not contain any hard data to support his opinion; (2) Ulanoff was not an economics or plastics expert; (3) Becker did not know whether Burstein was an engineer; and (4) Burstein was a client of Miller's and was not an independent expert. In addition, Ulanoff and Burstein each owned an interest in more than one partnership that owned Sentinel recyclers as part of the Plastics Recycling program.

Becker explained at trial that in the course of his practice when evaluating prospective investments for clients, he focuses on the economics of the transaction and investigates whether there is a need or market for the product or service. With

respect to the Partnership transactions, the records indicate that Becker overlooked several red flags regarding the economic viability and market for the Sentinel EPE recyclers. The offering memoranda for the Partnership transactions warned that there was no established market for the Sentinel EPE recyclers. Becker never saw any marketing plans for selling the pellets or leasing the recyclers. He accepted representations by PI personnel that they would be marketing the recyclers to clients and that there was a sufficient base of end-users for the machines, yet he never saw PI's client list. At the time of the closing of the Partnerships, Becker did not know who the end-users were or whether there were any end-users actually committed to the transaction.

Becker purportedly checked the price of the pellets by reading trade journals of the plastics industry. However, he did not use those same journals to investigate the recyclers' purported value or to see whether there were any advertisements for comparable machines. The record in these cases does not indicate that any of petitioners or their advisers other than Becker asked to see those journals for their own examination. In concluding that the Partnerships would be economically profitable, Becker made two assumptions that he concedes were unsupported by any hard data: (1) That there was a market for the pellets; and (2) that market demand for them would increase.

Becker also had a financial interest in SAB Reclamation and SAB Recovery. He received fees in excess of $500,000 with respect to the SAB Recycling Partnerships, more than $200,000 of which was derived from SAB Reclamation and SAB Recycling. Becker also received fees from individual investors for investment advice. In addition, Becker Co. received fees from the SAB Recycling Partnerships for preparing their partnership returns. As Becker himself testified, petitioners could not have read the offering materials and been ignorant of the financial benefits accruing to him.

We find that petitioners' purported reliance on Becker was not reasonable, not in good faith, nor based upon full disclosure. Becker's expertise was in taxation, not plastics materials or plastics recycling, and his investigation and analysis of the Plastics Recycling transactions reflected this circumstance. Selvin and David knew Becker was not expert in plastics materials or plastics recycling, and the Zenkels and Blount had no reason to believe otherwise. Becker testified that he was very careful not to mislead any of his clients regarding the particulars of his investigation. As he put it: "I don't recall saying to a client I did due diligence * * * [Rather,] I told [my clients] precisely what I had done to investigate or analyze the transaction. I didn't just say I did due diligence,

and leave it open for them to define what I might or might not have done."

The purported value of the Sentinel EPE recycler generated the deductions and credits in these cases, and that circumstance was reflected in the offering memoranda. Certainly Becker recognized the nature of the tax benefits and, given their education and business experience, petitioners should have recognized it as well. Yet neither petitioners nor Becker verified the purported value of the Sentinel EPE recycler. Becker confirmed at trial that he relied on PI for the value of the Sentinel EPE recyclers. Investors as sophisticated as petitioners either learned or should have learned the source and shortcomings of Becker's valuation information when he reported to them and "precisely" disclosed "what [he] had done to investigate or analyze the transaction." Accordingly, we hold that petitioners did not reasonably or in good faith rely on Becker as an expert or a qualified professional working in the area of his expertise to establish the fair market value of the Sentinel EPE recycler and the economic viability of the Partnership transactions. Becker never assumed such responsibility, and he fully described the particulars of his investigation, taking care not to mischaracterize it as "due diligence."

In the end, Becker and petitioners relied on PI personnel for the value of the Sentinel EPE recyclers and the economic viability of the Partnership transactions. See Vojticek v. Commissioner, T.C. Memo. 1995-444, to the effect that advice from such persons "is better classified as sales promotion." Becker did not have any education, special qualifications, or professional skills in plastics materials or plastics recycling. A taxpayer may rely upon his adviser's expertise (in these cases, accounting and tax advice), but it is not reasonable or prudent to rely upon a tax adviser regarding matters outside of his field of expertise or with respect to facts that he does not verify. See David v. Commissioner, 43 F.3d at 789-790; Goldman v. Commissioner, 39 F.3d at 408; Skeen v. Commissioner, 864 F.2d 93 (9th Cir. 1989), affg. Patin v. Commissioner, 88 T.C. 1086 (1987); Lax v. Commissioner, T.C. Memo. 1994-329; Sacks v. Commissioner, T.C. Memo. 1994-217; Rogers v. Commissioner, T.C. Memo. 1990-619; see also Estate of Busch v. Commissioner, T.C. Memo. 1996-342, Spears v. Commissioner, T.C. Memo. 1996-341, with respect to Becker's advice in Plastics Recycling cases.

### c. Steele and Sprague

Petitioners Zenkel and Blount purport to have relied on advisers other than or in addition to Becker. The only person with whom Blount discussed the Plastics Recycling transactions was Sprague, who in turn had spoken with Becker and Leicht.

Blount also gave a copy of the offering memorandum to his tax return preparer, Gowin.  Mr. Zenkel spoke to Becker; both he and Mrs. Zenkel spoke to Steele.

Blount learned about the Plastics Recycling transactions from Sprague.  Sprague suggested the Plastics Recycling transactions to Blount as an investment option after Blount mentioned that he was going to receive additional compensation income.  Sprague recalled introducing the investment to Blount in the following manner:  "[I]f you're looking for investments, you might contact Stephen Leicht or Stuart Becker, because I * * * understand that they, as a service to clients, do screen numerous such investments, <u>not to guarantee them but to just generally determine if they believe they would be suitable for referring *  * * to their clients to take a look at</u>."  (Emphasis added.) Sprague then went on to describe the Plastics Recycling information he had received from Leicht and Becker "in a general way."

Blount never spoke to Becker or Leicht.  He simply reviewed the offering memorandum, spoke with Sprague, and furnished the offering memorandum to his tax return preparer.  Sprague is not an expert in plastics materials or plastics recycling and could not evaluate the technical or engineering details of the Phoenix transaction.  He testified that in 1981 he "was a complete stranger to this notion of reprocessing plastics and recycling."

Sprague's investigation of Phoenix consisted of reading the offering memorandum and talking to Leicht and Becker. Blount has not shown that his tax return preparer, Gowin, possessed the requisite expertise in recycling or the plastics industry to have enabled her properly to evaluate the merits of the Phoenix transaction. In light of the foregoing, Blount will not be relieved of the negligence additions to tax based upon his purported reliance on Sprague and Gowin.

Mr. and Mrs. Zenkel each discussed the investment with Steele. Neither Steele nor Mr. Zenkel testified in docket No. 12091-89. Mrs. Zenkel could not recall the content of her conversations with Steele; she remembered only that he told her that the investment had tax benefits and that he responded positively when she asked him if SAB Reclamation was a worthwhile investment. Mrs. Zenkel testified that she did not know that Becker Co. was involved in tax-oriented investments, whether Steele had any background in plastics materials or plastics recycling, whether Becker or Steele investigated PI, whether they investigated and/or compared the recycler with any similar products, whether they investigated end-users, or whether either of them checked with independent plastics experts as to the value of the recycler. Mrs. Zenkel testified that if she had known any of the particulars of Becker's and Steele's investigation, she has since forgotten them. The record in docket No. 12091-89 does

not establish that the Zenkels' purported reliance on Steele was reasonable, in good faith, or based upon full disclosure.

### 3. The Private Offering Memoranda

In addition to purportedly relying on Becker, Steele, and/or Sprague, petitioners maintain that they reasonably relied upon the offering memoranda and the tax opinion letter appended thereto. However, petitioners' testimony and actions indicate that they did not thoroughly review or study all of the information set out in the offering memoranda and that they ultimately did not place a great deal of reliance, if any, on the representations therein.

The offering memoranda included numerous caveats and warnings with respect to the Partnerships, including: (1) The substantial likelihood of audit by the IRS and a likely challenge of the purported value of the recyclers; (2) the general partners' lack of experience in marketing recycling or similar equipment; (3) the lack of an established market for the recyclers; and (4) uncertainties regarding the market prices for virgin resin and the possibility that recycled pellets would not be as marketable as virgin pellets. In addition, the offering memoranda noted a number of conflicts of interest, including Miller's interest in F & G Corp. and his representation of Burstein, PI, and Grant, who was the sole shareholder of ECI Corp. A careful consideration of the materials in the respective

offering memoranda in these cases, especially the discussions of high writeoffs and risk of audit, should have alerted a prudent and reasonable investor to the questionable nature of the promised deductions and credits.  See Collins v. Commissioner, 857 F.2d 1383, 1386 (9th Cir. 1988), affg. Dister v. Commissioner, T.C. Memo. 1987-217; Sacks v. Commissioner, T.C. Memo. 1994-217.

In each case, the projected tax benefits in the respective offering memoranda exceeded petitioners' respective investments. According to the offering memoranda, for each $50,000 investor, the projected first-year tax benefits were investment tax credits in excess of $82,500 plus deductions in excess of $39,000. Specifically, the projected investment tax credits and deductions for the Partnerships in the first year of the investment for each $50,000 investor were as follows:  $82,639 and $39,323 for Scarborough in 1981; $84,813 and $40,671 for Phoenix in 1981; $82,639 and $40,037 for SAB Recycling in 1982; and $83,712 and $40,234 for SAB Reclamation in 1982.

For Mrs. Zenkel's gross $50,000 investment, the Zenkel's claimed an operating loss in the amount of $40,100 and investment tax and business energy credits in the amount of $83,712.  As a result of his gross $25,000 investment, Blount claimed a $20,520 operating loss and $42,402 in investment tax and business energy credits.  For their gross $25,000 investment, the Davids claimed

an operating loss in the amount of $19,871 and investment tax and business energy credits totaling $41,320. For their $27,000 investment, the Selvins claimed investment tax and business energy credits in the amount of $44,626.

The direct reductions in petitioners' Federal income tax, from the investment tax credits alone, ranged from 149 percent to 170 percent of their cash investments, without consideration of any rebated commissions or advance royalty payments. Therefore, after adjustments of withholding, estimated tax, or final payment, like the taxpayers in Provizer v. Commissioner, T.C. Memo. 1992-177, "except for a few weeks at the beginning, petitioners never had any money in the * * * [Partnership transactions]." In view of the disproportionately large tax benefits claimed on petitioners' 1981 and 1982 Federal income tax returns, relative to the dollar amounts invested, further investigation of the Partnership transactions clearly was required. A reasonably prudent person would have asked a qualified independent tax adviser if this windfall were not too good to be true. McCrary v. Commissioner, 92 T.C. at 850. A reasonably prudent person would not conclude without substantial investigation that the Government was providing tax benefits so disproportionate to the taxpayers' investment of their own capital.

Petitioners' reliance upon the Court of Appeals for the Ninth Circuit's partial reversal of our decision in Osterhout v. Commissioner, T.C. Memo. 1993-251, affd. in part and revd. in part without published opinion sub nom. Balboa Energy Fund 1981 v. Commissioner, 85 F.3d 634 (9th Cir. 1996), is misplaced.  In Osterhout, we found that certain oil and gas partnerships were not engaged in a trade or business and sustained respondent's imposition of the negligence additions to tax with respect to one of the partners therein.[5]  The Court of Appeals for the Ninth Circuit reversed our imposition of the negligence additions to tax.  Petitioners point out that the taxpayer in that case relied in part upon a tax opinion contained in the offering materials.  However, the offering memoranda for the Partnerships herein warned prospective investors that the accompanying tax opinion letters were not in final form, and were prepared for the general partner, and that prospective investors should consult their own professional advisers with respect to the tax benefits and tax risks associated with the respective Partnerships.  The tax opinion letters accompanying the SAB Reclamation and SAB

---

[5]     Osterhout v. Commissioner, T.C. Memo. 1993-251, affd. in part and revd. in part without published opinion sub nom. Balboa Energy Fund 1981 v. Commissioner, 85 F.3d 634 (9th Cir. 1996), involved a group of consolidated cases.  The parties therein agreed to be bound by the Court's opinion regarding the application of the additions to tax under sec. 6653(a), inter alia.  Accordingly, although the Court's analysis focused on one taxpayer, the additions to tax were sustained with respect to all of the taxpayers.

Recycling offering memoranda were addressed solely to the general partner and began with the following disclaimer:

> This opinion is provided to <u>you for your individual guidance</u>. <u>We expect that prospective investors will rely upon their own professional advisors</u> with respect to all tax issues arising in connection with an investment in the Partnership and the operations thereof. We recognize that you intend to include this letter with your offering materials and we have consented to that with the understanding that <u>the purpose in distributing it is</u> to assist your offerees' and their tax advisors in making their own analysis and <u>not to permit any prospective investor to rely upon our advice in this matter</u>. [Emphasis added.]

A similar disclaimer appears in the tax opinion letter accompanying the Scarborough offering memorandum. (The copy of the Phoenix offering memorandum submitted into the record of docket No. 19760-89 is missing page 1 of the tax opinion letter, the page that contains the opening disclaimer). Accordingly, the tax opinion letters expressly indicate that prospective investors such as petitioners were not to rely upon the tax opinion letters. See <u>Collins v. Commissioner</u>, 857 F.2d at 1386. The limited, technical opinion of tax counsel expressed in these letters was not designed as advice upon which taxpayers might rely and the opinion of counsel itself so states.

### 4. Miscellaneous

The parties in these consolidated cases stipulated that the fair market value of a Sentinel EPE recycler in 1981 and 1982 was not in excess of $50,000. Notwithstanding this concession, petitioners contend that they were reasonable in claiming credits

on their Federal income tax returns based upon each recycler having a value of $1,162,666. In support of this position, petitioners submitted into evidence preliminary reports prepared for respondent by Ernest D. Carmagnola (Carmagnola), the president of Professional Plastic Associates. Carmagnola had been retained by the IRS in 1984 to evaluate the Sentinel EPE and EPS recyclers in light of what he described as "the fantastic values placed on the [recyclers] by the owners." Based on limited information available to him at that time, Carmagnola preliminarily estimated that the value of the Sentinel EPE recycler was $250,000. However, after additional information became available to him, Carmagnola concluded in a signed affidavit, dated March 16, 1993, that the machines actually had a fair market value of not more than $50,000 each in the fall of 1981 and 1982.

We accord no weight to the Carmagnola reports submitted by petitioners. The projected valuations therein were based on inadequate information, research, and investigation, and were subsequently rejected and discredited by their author. In one preliminary report, Carmagnola states that he has "a serious concern of actual profit" from a Sentinel EPE recycler and that to determine whether the machines actually could be profitable, he required additional information from PI. Carmagnola also indicates that in preparing the report, he did not have

information available concerning research and development costs of the machines and that he estimated those costs in his valuations of the machines.

Respondent rejected the Carmagnola reports and considered them unsatisfactory for any purpose; and there is no indication in the records that respondent used them as a basis for any determinations in the notices of deficiency. Even so, petitioners' counsel obtained copies of these reports and urge that they support the reasonableness of the values reported on petitioners' returns. Not surprisingly, petitioners' counsel did not call Carmagnola to testify in these cases, but preferred instead to rely solely upon his preliminary, ill-founded valuation estimates. Carmagnola has not been called to testify in any of the Plastics Recycling cases before us. The Carmagnola reports were a part of the record considered by this Court and reviewed by the Court of Appeals for the Sixth Circuit in the Provizer case, where we held the taxpayers negligent. Consistent therewith, we find in these cases, as we have found previously, that the reports prepared by Carmagnola are unreliable and of no consequence. Petitioners are not relieved of the negligence additions to tax based on the preliminary reports prepared by Carmagnola.

Petitioners rely on Reile v. Commissioner, T.C. Memo. 1992-488, Davis v. Commissioner, T.C. Memo. 1989-607, and Mollen v.

United States, 72 AFTR 2d 93-6443, 93-2 USTC par. 50,585 (D. Ariz. 1993). This Court declined to sustain the negligence additions to tax in the Reile and Davis cases for reasons inapposite to the facts herein. In the Davis case, the taxpayers reasonably relied upon a "trusted and long-term adviser" who was independent of the investment venture, and the offering materials reviewed by the taxpayers did not reflect that the principals in the venture lacked experience in the pertinent line of business. In the Reile case, the taxpayers, a married couple, had only one year of college between them and characterized themselves as financial "dummies." In contrast to those cases, petitioners herein are well educated, sophisticated, and successful professional and business people. Their reliance on Becker, Steele, and/or Sprague with respect to the essential valuation issue and the economic viability and bona fides of the Partnership transactions was misplaced and inconsistent with Becker's disclosure of the limitations of his investigation. Although Blount did not talk to Becker, Sprague related to Blount the particulars of Becker's investigation. In addition, the offering memoranda disclosed that the Partnerships had no prior operating history and that the general partner had no prior experience in marketing recycling or similar equipment. Accordingly, petitioners' reliance on the Reile and Davis cases is misplaced.

In Mollen, the taxpayer was a medical doctor who specialized in diabetes and who, on behalf of the Arizona Medical Association, led a continuing medical education (CME) accreditation program for local hospitals. The underlying tax matter involved the taxpayer's investment in Diabetics CME Group, Ltd., a limited partnership that invested in the production, marketing, and distribution of medical educational video tapes. The District Court found that the taxpayer's personal expertise and insight in the underlying investment gave him reason to believe it would be economically profitable. Although the taxpayer was not experienced in business or tax matters, he did consult with an accountant and a tax lawyer regarding those matters. Moreover, the District Court noted that the propriety of the taxpayer's disallowed deduction therein was "reasonably debatable." Id.

Neither petitioners nor Becker had any formal education, expertise, or experience in plastics materials or plastics recycling. None of them had any personal insight or industry know-how in plastics recycling that would reasonably lead them to believe that the Plastics Recycling transactions would be economically profitable. Becker and petitioners relied upon representations by insiders to the Plastics Recycling transactions, and neither he nor petitioners hired any independent experts in the field of plastic materials or plastics

recycling.  Becker purportedly discussed the transactions with Canno, who apparently was familiar with the plastics industry, but Canno was not hired by Becker to investigate PI and the Sentinel EPE recycler, never saw a Sentinel EPE recycler, and never prepared any kind of formal, written analysis of the venture.  Accordingly, we consider petitioners' arguments with respect to the Mollen case inapplicable under the circumstances of these cases.

Petitioners also rely on two recent decisions by the Court of Appeals for the Fifth Circuit that reversed this Court's imposition of the negligence additions to tax in non-plastics recycling cases:  Durrett v. Commissioner, 71 F.3d 515 (5th Cir. 1996), affg. in part and revg. in part T.C. Memo. 1994-179; and Chamberlain v. Commissioner, 66 F.3d 729 (5th Cir. 1995), affg. in part and revg. in part T.C. Memo. 1994-228.  The taxpayers in the Durrett and Chamberlain cases were among thousands who invested in the First Western tax shelter program involving alleged straddle transactions of forward contracts.  In the Durrett and Chamberlain cases, the Court of Appeals for the Fifth Circuit concluded that the taxpayers reasonably relied upon professional advice concerning tax matters.  In other First Western cases, however, the Courts of Appeals have affirmed decisions of the Tax Court imposing negligence additions to tax. See Chakales v. Commissioner, T.C. Memo. 1994-408 (reliance on

long-term adviser who was a tax attorney and accountant, and who in turn relied on a promoter of the venture, held unreasonable), affd. 79 F.3d 726 (8th Cir. 1996); Kozlowski v. Commissioner, T.C. Memo. 1993-430 (reliance on adviser held unreasonable absent a showing that the adviser understood the transaction and was qualified to give an opinion whether it was bona fide), affd. without published opinion 70 F.3d 1279 (9th Cir. 1995); Freytag v. Commissioner, 89 T.C. 849 (1987) (reliance on tax advice given by attorneys and C.P.A.'s held unreasonable absent a showing that the taxpayers consulted any experts regarding the bona fides of the transactions), affd. 904 F.2d 1011 (5th Cir. 1990), affd. 501 U.S. 868 (1991).  Here we have found that none of the advisers consulted by petitioners possessed sufficient knowledge of the plastics recycling business to render a competent opinion.  This factor has been deemed relevant by the Court of Appeals for the Second Circuit, the Court to which appeal in these cases lie. See David v. Commissioner, 43 F.3d at 789-790 (taxpayers' reliance on expert advice not reasonable where expert lacks knowledge of business in which taxpayers invested); Goldman v. Commissioner, 39 F.3d at 408 (same).  Accordingly, we will not relieve petitioners of the negligence additions to tax on the basis of petitioners' reliance on the Court of Appeals' decisions in the Durrett and Chamberlain cases.

## 5. Conclusion as to Negligence

Under the circumstances of these cases, petitioners failed to exercise due care in claiming large deductions and tax credits with respect to the Partnerships on their respective Federal income tax returns.  Petitioners did not reasonably rely upon the offering memoranda, or on Becker, Steele, and/or Sprague, and they did not in good faith investigate the underlying viability, financial structure, and economics of the Partnership transactions herein.  We are unconvinced by the claims of these highly sophisticated, able, and successful business people that they reasonably failed to inquire about their investments and simply relied on the offering circulars and on Steele, Sprague, and ultimately Becker, despite warnings in the offering circulars and explanations by Becker about the limitations of his investigation.  In each case, these taxpayers knew or should have known better.  We hold, upon consideration of the entire records, that petitioners are liable for the negligence additions to tax under the provisions of section 6653(a)(1) and (2) for the taxable years at issue.  Respondent is sustained on this issue.

## C.  Section 6659--Valuation Overstatement

Respondent determined that petitioners are each liable for the section 6659 addition to tax on the portion of their respective underpayments attributable to valuation overstatement.

Petitioners have the burden of proving that respondent's determinations of these section 6659 additions to tax are erroneous.  Rule 142(a); <u>Luman v. Commissioner</u>, 79 T.C. at 860-861.

A graduated addition to tax is imposed when an individual has an underpayment of tax that equals or exceeds $1,000 and "is attributable to" a valuation overstatement.  Sec. 6659(a), (d).  A valuation overstatement exists if the fair market value (or adjusted basis) of property claimed on a return equals or exceeds 150 percent of the amount determined to be the correct amount.  Sec. 6659(c).  If the claimed valuation exceeds 250 percent of the correct value, the addition is equal to 30 percent of the underpayment.  Sec. 6659(b).

Petitioners claimed tax benefits, including an investment tax credit and a business energy credit, based on purported values of $1,162,666 for each Sentinel EPE recycler.  Petitioners concede that the fair market value of a Sentinel EPE recycler in 1981 and 1982 was not in excess of $50,000.  Therefore, if disallowance of petitioners' claimed tax benefits is attributable to such valuation overstatements, petitioners are liable for the section 6659 addition to tax at the rate of 30 percent of the underpayment of tax attributable to the tax benefits claimed with respect to the Partnerships.

Petitioners argue that section 6659 does not apply in their cases for the following reasons: (1) Disallowance of the claimed tax benefits was attributable to other than a valuation overstatement; (2) petitioners' concessions of the claimed tax benefits precludes imposition of the section 6659 additions to tax; and (3) respondent erroneously failed to waive the section 6659 addition to tax. We reject each of these arguments in these cases for reasons set forth below.

1. The Grounds for Petitioners' Underpayments

Section 6659 does not apply to underpayments of tax that are not "attributable to" valuation overstatements. See McCrary v. Commissioner, 92 T.C. 827 (1989); Todd v. Commissioner, 89 T.C. 912 (1987), affd. 862 F.2d 540 (5th Cir. 1988). To the extent taxpayers claim tax benefits that are disallowed on grounds separate and independent from alleged valuation overstatements, the resulting underpayments of tax are not regarded as attributable to valuation overstatements. Krause v. Commissioner, 99 T.C. 132, 178 (1992) (citing Todd v. Commissioner, supra), affd. sub nom. Hildebrand v. Commissioner, 28 F.3d 1024 (10th Cir. 1994). However, when valuation is an integral factor in disallowing deductions and credits, section 6659 is applicable. See Illes v. Commissioner, 982 F.2d 163, 167 (6th Cir. 1992), affg. T.C. Memo. 1991-449; Gilman v.

Commissioner, 933 F.2d 143, 151 (2d Cir. 1991) (section 6659 addition to tax applies if a finding of lack of economic substance is "due in part" to a valuation overstatement), affg. T.C. Memo. 1989-684; Masters v. Commissioner, T.C. Memo. 1994-197, affd. without published opinion 70 F.3d 1262 (4th Cir. 1995); Harness v. Commissioner, T.C. Memo. 1991-321.

Petitioners argue that the disallowance of the claimed tax benefits was not "attributable to" a valuation overstatement. According to petitioners, the tax benefits were disallowed because the Partnership transactions lacked economic substance, not because of any valuation overstatements. It follows, petitioners reason, that because the "attributable to" language of section 6659 requires a direct causative relationship between a valuation overstatement and an underpayment in tax, section 6659 cannot apply to their deficiencies. Petitioners cite in support of this argument, Todd v. Commissioner, supra; Heasley v. Commissioner, 902 F.2d 380 (5th Cir. 1990), revg. T.C. Memo. 1988-408; Gainer v. Commissioner, 893 F.2d 225 (9th Cir. 1990), affg. T.C. Memo. 1988-416; McCrary v. Commissioner, supra.

Petitioners' argument rests on the mistaken premise that our holding herein that the Partnership transactions lacked economic substance was separate and independent from the overvaluation of the Sentinel EPE recyclers. To the contrary, in holding that the

Partnership transactions lacked economic substance, we relied heavily upon the overvaluation of the recyclers. Overvaluation of the recyclers was an integral factor in regard to: (1) The disallowed tax credits and other benefits in these cases; (2) the underpayments of tax; and (3) our finding that the Partnership transactions lacked economic substance.

Petitioners argue that in Provizer v. Commissioner, T.C. Memo. 1992-177, we found that the Clearwater transaction lacked economic substance for reasons independent of the valuation reported in that case. According to petitioners, the purported value of the recyclers in the Clearwater transaction was predicated upon a projected stream of royalty income, and this Court merely rejected the taxpayers' valuation method. Petitioners misread and distort our Provizer opinion. In the Provizer case, overvaluation of the Sentinel EPE recyclers, irrespective of the technique employed by the taxpayers in their efforts to justify the overvaluation, was the dominant factor that led us to hold that the Clearwater transaction lacked economic substance. Likewise, overvaluation of the Sentinel EPE recyclers in these cases is the ground for our holding herein that the Partnership transactions lacked economic substance.

Moreover, a virtually identical argument was recently rejected in Gilman v. Commissioner, supra, by the Court of

Appeals for the Second Circuit, the Court to which appeal in these cases lie.  See Golsen v. Commissioner, 54 T.C. 742, 756-758 (1970), affd. 445 F.2d 985 (10th Cir. 1971).  In the Gilman case, the taxpayers engaged in a computer equipment sale and leaseback transaction that this Court held was a sham transaction lacking economic substance.  The taxpayers therein, citing Todd v. Commissioner, supra, and Heasley v. Commissioner, supra, argued that their underpayment of taxes derived from nonrecognition of the transaction for lack of economic substance, independent of any overvaluation.  The Court of Appeals for the Second Circuit sustained imposition of the section 6659 addition to tax because overvaluation of the computer equipment contributed directly to this Court's earlier conclusion that the transaction lacked economic substance and was a sham.  Gilman v. Commissioner, supra at 151.  In addition, the Court of Appeals for the Second Circuit agreed with this Court and with the Court of Appeals for the Eighth Circuit that "'when an underpayment stems from disallowed * * * investment credits due to lack of economic substance, the deficiency is * * * subject to the penalty under section 6659.'"  Gilman v. Commissioner, supra at 151 (quoting Massengill v. Commissioner, 876 F.2d 616, 619-620 (8th Cir. 1989), affg. T.C. Memo. 1988-427); see also Rybak v. Commissioner, 91 T.C. 524, 566-567 (1988); Zirker v.

Commissioner, 87 T.C. 970, 978-979 (1986); Donahue v. Commissioner, T.C. Memo. 1991-181, affd. without published opinion 959 F.2d 234 (6th Cir. 1992), affd. sub nom. Pasternak v. Commissioner, 990 F.2d 893 (6th Cir. 1993).

Petitioners' reliance on Gainer v. Commissioner, supra, Todd v. Commissioner, 862 F.2d 540 (5th Cir. 1988), and McCrary v. Commissioner, supra, is misplaced. In those cases, in contrast to the consolidated cases herein, it was found that a valuation overstatement did not contribute to an underpayment of taxes. In the Todd and Gainer cases, the underpayments were due exclusively to the fact that the property in each case had not been placed in service. In the McCrary case, the underpayments were deemed to result from a concession that the agreement at issue was a license and not a lease. Although property was overvalued in each of those cases, the overvaluations were not the ground on which the taxpayers' liability was sustained. In contrast, "a different situation exists where a valuation overstatement * * * is an integral part of or is inseparable from the ground found for disallowance of an item." McCrary v. Commissioner, 92 T.C. at 859. Each of these consolidated cases presents just such a "different situation": overvaluation of the recyclers was integral to and inseparable from petitioners' claimed tax

benefits and our holding that the Partnership transactions lacked economic substance.[6]

## 2. Concession of the Deficiency

Petitioners argue that their concessions of the deficiencies preclude imposition of the section 6659 additions to tax. Petitioners contend that their concessions render any inquiry into the grounds for such deficiencies moot. Absent such inquiry, petitioners argue that it cannot be known if their underpayments were attributable to a valuation overstatement or other discrepancy. Without a finding that a valuation overstatement contributed to an underpayment, according to petitioners, section 6659 cannot apply. In support of this line of reasoning, petitioners rely heavily upon Heasley v. Commissioner, 902 F.2d 380 (5th Cir. 1990), and McCrary v. Commissioner, supra.

---

[6] To the extent that Heasley v. Commissioner, 902 F.2d 380 (5th Cir. 1990), revg. T.C. Memo. 1988-408, merely represents an application of Todd v. Commissioner, 89 T.C. 912 (1987), affd. 862 F.2d 540 (5th Cir. 1988), we consider it distinguishable. To the extent that the reversal in the Heasley case is based on a concept that where an underpayment derives from the disallowance of a transaction for lack of economic substance, the underpayment cannot be attributable to an overvaluation, this Court and the Court of Appeals for the Second Circuit have disagreed. See Gilman v. Commissioner, 933 F.2d 143, 151 (2d Cir. 1991): "The lack of economic substance was due in part to the overvaluation, and thus the underpayment was attributable to the valuation overstatement."

Petitioners' open-ended concessions do not obviate our finding that the Partnership transactions lacked economic substance due to overvaluation of the recyclers. This is not a situation where we have "to decide difficult valuation questions for no reason other than the application of penalties." See McCrary v. Commissioner, supra at 854 n. 14. The value of the Sentinel EPE recycler was established in Provizer v. Commissioner, T.C. Memo. 1992-177, and stipulated by the parties. As a consequence of the inflated value assigned to the recyclers by the Partnerships, petitioners claimed deductions and credits that resulted in underpayments of tax, and we held that the Partnership transactions lacked economic substance. Regardless of petitioners' concessions, in these cases the underpayments of tax were attributable to the valuation overstatements.

Moreover, concession of the investment tax credit in and of itself does not relieve taxpayers of liability for the section 6659 addition to tax. See Dybsand v. Commissioner, T.C. Memo. 1994-56; Chiechi v. Commissioner, T.C. Memo. 1993-630. Instead, the ground upon which the investment tax credit is disallowed or conceded is significant. Even in situations in which there are arguably two grounds to support a deficiency and one supports a section 6659 addition to tax and the other does not, the taxpayer may still be liable for the addition to tax. Gainer v.

- 71 -

Commissioner, 893 F.2d at 228; Irom v. Commissioner, 866 F.2d
545, 547 (2d Cir. 1989), vacating in part T.C. Memo. 1988-211;
Harness v. Commissioner, T.C. Memo. 1991-321.

In the present cases, no argument was made and no evidence
was presented to the Court to prove that disallowance and
concession of the investment tax credits related to anything
other than a valuation overstatement.  To the contrary,
petitioners each stipulated substantially the same facts
concerning the Partnership transactions as we found in Provizer
v. Commissioner, supra.  In the Provizer case, we held that the
taxpayers were liable for the section 6659 addition to tax
because the underpayment of taxes was directly related to the
overvaluation of the Sentinel EPE recyclers.  The overvaluation
of the recyclers, exceeding 2325 percent, was an integral part of
our findings in Provizer that the transaction was a sham and
lacked economic substance.  Similarly, the records in these cases
plainly show that the overvaluation of the recyclers is integral
to and is the core of our holding that the underlying
transactions here were shams and lacked economic substance.

Petitioners' reliance on McCrary v. Commissioner, supra, is
misplaced.  In that case, the taxpayers conceded disentitlement
to their claimed tax benefits, and the section 6659 additions to
tax were held inapplicable.  However, the concessions of the

claimed tax benefits, in and of themselves, did not preclude imposition of the section 6659 additions to tax. In McCrary v. Commissioner, supra, the section 6659 addition to tax was disallowed because the agreement at issue was conceded to be a license and not a lease. In contrast, the records in petitioners' cases plainly show that petitioners' underpayments were attributable to overvaluation of the Sentinel EPE recyclers. We hold that petitioners' reliance on McCrary v. Commissioner, supra, is inappropriate.[7]

We held in Provizer v. Commissioner, supra, that each Sentinel EPE recycler had a fair market value not in excess of $50,000. Our finding in the Provizer case that the Sentinel EPE recyclers had been overvalued was integral to and inseparable from our holding of a lack of economic substance. Petitioners stipulated that the Partnership transactions were similar to the Clearwater transaction described in the Provizer case, and that the fair market value of a Sentinel EPE recycler in 1981 and 1982 was not in excess of $50,000. Given those concessions, and the

---

[7] Petitioners' citation of Heasley v. Commissioner, supra, in support of the concession argument is also inappropriate. That case was not decided by the Court of Appeals for the Fifth Circuit on the basis of a concession. Moreover, see supra note 6, to the effect that the Court of Appeals for the Second Circuit and this Court have not followed the Heasley opinion with respect to the application of sec. 6659.

fact that the records here plainly show that the overvaluation of the recyclers was the underlying reason for disallowance of the claimed tax benefits, we conclude that the deficiencies were attributable to overvaluation of the Sentinel EPE recyclers.

### 3.  Section 6659(e)

Petitioners argue that respondent erroneously failed to waive the section 6659 additions to tax.  Section 6659(e) authorizes respondent to waive all or part of the addition to tax for valuation overstatements if taxpayers establish that there was a reasonable basis for the adjusted bases or valuations claimed on the returns and that such claims were made in good faith.  Respondent's refusal to waive a section 6659 addition to tax is reviewable by this Court for abuse of discretion.  Krause v. Commissioner, 99 T.C. at 179.  Abuse of discretion has been found in situations where respondent's refusal to exercise her discretion is arbitrary, capricious, or unreasonable.  See Mailman v. Commissioner, 91 T.C. 1079 (1988); Estate of Gardner v. Commissioner, 82 T.C. 989 (1984); Haught v. Commissioner, T.C. Memo. 1993-58.  We note initially that petitioners did not request respondent to waive the section 6659 additions to tax until many months after the trials of the these cases.  We are reluctant to find that respondent abused her discretion in cases in which she was not timely requested to exercise it and where

there is no direct evidence of any abuse of administrative discretion. Haught v. Commissioner, supra; cf. Wynn v. Commissioner, T.C. Memo. 1995-609; Klieger v. Commissioner, T.C. Memo. 1992-734.

However, we do not decide this issue solely on petitioners' failure timely to request waivers but, instead, we have considered the issue on its merits.

Petitioners urge that they relied on the respective offering materials and Becker, Steele, and/or Sprague in deciding on the valuation claimed on their tax returns. Petitioners contend that such reliance was reasonable, and, therefore, respondent should have waived the section 6659 additions to tax. However, as we explained above in finding petitioners liable for the negligence additions to tax, petitioners' purported reliance on the offering materials and their advisers was not reasonable.

The offering materials for the Partnerships contained numerous warnings and caveats, including the likelihood that the value placed on the recyclers would be challenged by the IRS as being in excess of fair market value. Further, petitioners' testimony raises doubts as to the extent to which they reviewed the offering memoranda or sought to resolve the numerous issues raised in the memoranda.

Sprague and Becker readily admitted that they possessed no special qualifications or professional skills in the recycling or plastics industries.  Steele did not testify, and there is no showing in the records that he possessed any education or experience in plastics materials or plastics recycling.  Neither Becker, Steele, nor Sprague ever hired or consulted any plastics engineering or technical experts with respect to the Plastics Recycling transactions.  Becker spoke with his client Canno, who apparently had some knowledge of the plastics industry, but the substance of Canno's purported comments is doubtful and he had only minimal information about the transaction.  At trial Becker confirmed that in the end he relied exclusively on PI, its personnel, and the offering materials as to the value and purported uniqueness of the machines.  Sprague relied on Becker, and Steele assisted Becker.

In support of their contention that they acted reasonably, petitioners cite Mauerman v. Commissioner, 22 F.3d 1001 (10th Cir. 1994), revg. T.C. Memo. 1993-23.  However, the facts in the Mauerman case are distinctly different from the facts of these cases.  In Mauerman, Court of Appeals for the Tenth Circuit held that the Commissioner had abused her discretion by not waiving a section 6661 addition to tax.  Like section 6659, a section 6661 addition to tax may be waived by the Commissioner if the taxpayer

demonstrates that there was reasonable cause for his underpayment and that he acted in good faith.  Sec. 6661(c).  The taxpayer in Mauerman relied upon independent attorneys and accountants for advice as to whether payments were properly deductible or capitalized.  The advice relied upon by the taxpayer in Mauerman was within the scope of the advisers' expertise, the interpretation of the tax laws as applied to undisputed facts. In these cases, particularly with respect to valuation, petitioners relied upon advice that was outside the scope of expertise and experience of their advisers.  Consequently, we consider petitioners' reliance on the Mauerman case inapplicable.

We hold that petitioners did not have a reasonable basis for the adjusted bases or valuations claimed on their tax returns with respect to their investments in the Partnerships.  In these cases, respondent properly could find that petitioners' respective reliance on the offering materials, Becker, Steele, and/or Sprague was unreasonable.  The records in these cases do not establish an abuse of discretion on the part of respondent but support respondent's position.  We hold that respondent's refusal to waive the section 6659 addition to tax is not an abuse of discretion.  Petitioners are liable for the respective section 6659 additions to tax at the rate of 30 percent of the

underpayments of tax attributable to the disallowed tax benefits. Respondent is sustained on this issue.

## D.  Petitioners' Motions For Leave To File Motion For Decision Ordering Relief From the Negligence Penalty and the Penalty Rate of Interest and To File Supporting Memorandum of Law

Long after the trials of these cases, petitioners in docket Nos. 19760-89, 24512-89, and 10147-91 each filed a Motion For Leave To File Motion for Decision Ordering Relief From the Negligence Penalty and the Penalty Rate of Interest and To File Supporting Memorandum of Law under Rule 50.  In addition, they lodged with the Court motions for decision ordering relief from the additions to tax for negligence and from the increased rate of interest, with attachments, and memoranda in support of such motions.  Respondent filed objections, with attachments, and memoranda in support thereof and petitioners thereafter filed reply memoranda.  Petitioners argue that they should be afforded the same settlement that was reached between other taxpayers and the IRS in Miller v. Commissioner, docket Nos. 10382-86 and 10383-86.  See Farrell v. Commissioner, T.C. Memo. 1996-295, denying a similar motion based in part on analogous circumstances.

Counsel for petitioners seek to raise a new issue long after the trials in these cases.  Resolution of such issue might well require new trials.  Such further trials "would be contrary to

the established policy of this Court to try all issues raised in a case in one proceeding and to avoid piecemeal and protracted litigation."  Markwardt v. Commissioner, 64 T.C. 989, 998 (1975); see also Robin Haft Trust v. Commissioner, 62 T.C. 145, 147 (1974).  Consequently, under the circumstances here, at this late date in the litigation proceedings, long after the trials and briefing and after the issuance of numerous opinions on issues and facts closely analogous to those in these cases, petitioners' motions for leave are not well founded.  Farrell v. Commissioner, supra.

Even if petitioners' motions for leave were granted, the arguments set forth in each of petitioners' motions for decision and attached memoranda, lodged with this Court, are without merit and such motions would be denied.  Therefore, and for reasons set forth in more detail below, petitioners' motions for leave shall be denied.

Some of our discussion of background circumstances underlying petitioners' motions is drawn from documents submitted by the parties and findings of this Court in two earlier decisions.  Such matters are not disputed by the parties.  See Estate of Satin v. Commissioner, T.C. Memo. 1994-435; Fisher v. Commissioner, T.C. Memo. 1994-434.  The Estate of Satin and Fisher cases involved Stipulation of Settlement agreements

(piggyback agreements) made available to taxpayers in the Plastics Recycling project, whereby taxpayers could agree to be bound by the results of three test cases:  the <u>Provizer</u> case and the two <u>Miller</u> cases.  We held in the <u>Estate of Satin</u> and <u>Fisher</u> cases that the terms of the piggyback agreement bound the parties to the results in all three lead cases, not just the <u>Provizer</u> case.  Petitioners assert that the piggyback agreement was extended to them, but they do not claim to have accepted the offer, so they effectively rejected it.  We discuss the background matters, apparently not disputed by the parties, for the sake of completeness.  As we have noted, granting petitioners' motion for leave would require further proceedings.

On or about February 1988, a settlement offer (the Plastics Recycling project settlement offer or the offer) was made available by respondent in all docketed Plastics Recycling cases, and subsequently in all nondocketed cases.  <u>Baratelli v. Commissioner</u>, T.C. Memo. 1994-484.[8]  Pursuant to the offer, taxpayers had 30 days to accept the following terms:

---

[8]     Although the records do not include a settlement offer to petitioners, petitioners have attached to their motions for decision a copy of a settlement offer to another taxpayer with respect to a plastics recycling case, and respondent has not disputed the accuracy of the statement of the plastics recycling settlement offer.

(1) Allowance of a deduction for 50 percent of the amount of the cash investment in the venture in the year(s) of investment to the extent of loss claimed; (2) Government concession of the substantial understatement of tax penalties under section 6661 and the negligence additions to tax under section 6653(a)(1) and (2); (3) taxpayer concession of the section 6659 addition to tax for valuation overstatement and the increased rate of interest under section 6621; and (4) execution of a closing agreement (Form 906) stating the settlement and resolving the entire matter for all years.  Petitioners assert that the Plastics Recycling project settlement offer was extended to them, but they do not claim to have accepted the offer timely, so they effectively rejected it.

In December 1988, the Miller cases were disposed of by settlement agreement between the taxpayers and respondent.[9]  This Court entered decisions based upon those settlements on December 22, 1988.  The settlement provided that the taxpayers in the Miller cases were liable for the addition to tax under section 6659 for valuation overstatement, but not for the additions to tax under sections 6661 and 6653(a).  The increased interest

---

[9]    Although it is not otherwise a part of the record in these cases, respondent attached copies of the Miller closing agreement and disclosure waiver to her objections to petitioners' motion for leave, and petitioners do not dispute the accuracy of the document.

under section 6621(c), premised solely upon Miller's interest in the recyclers for the taxable years at issue, was not applicable because Miller made payments prior to December 31, 1984, so no interest accrued after that time. Respondent did not notify petitioners or any other taxpayers of the disposition of the Miller cases. Estate of Satin v. Commissioner, T.C. Memo. 1994-435; Fisher v. Commissioner, T.C. Memo. 1994-434.

Petitioners argue that they are similarly situated to the taxpayer in the Miller cases, and that in accordance with the principle of "equality" they are therefore entitled to the same settlement agreement executed by respondent and Miller in those cases. In effect, petitioners seek to resurrect the piggyback agreement offer and the settlement offer that they previously failed to accept.

Petitioners contend that under the principle of "equality," the Commissioner has a duty of consistency toward similarly situated taxpayers and cannot tax one and not tax another without some rational basis for the difference. United States v. Kaiser, 363 U.S. 299, 308 (1960) (Frankfurther, J., concurring opinion); see Baker v. United States, 748 F.2d 1465 (11th Cir. 1984), affg. 575 F.Supp. 508 (N.D. Ga. 1983); Farmers' & Merchants' Bank v. United States, 476 F.2d 406 (4th Cir. 1973). According to petitioners, the principle of equality precludes the Commissioner

from making arbitrary distinctions between like cases.  See <u>Baker v. Commissioner</u>, 787 F.2d 637, 643 (D.C. Cir. 1986), vacating 83 T.C. 822 (1984).

The different tax treatment accorded petitioners and Miller was not arbitrary or irrational.  While petitioners and Miller both invested in the Plastics Recycling project, their actions with respect to such investments provide a rational basis for treating them differently.  Specifically, Miller foreclosed any potential liability for increased interest in his cases by making payment of the tax prior to December 31, 1984; no interest accrued after that date.  In contrast, petitioners made no such payment, and they conceded that the increased rate of interest under section 6621(c) applies in their cases.  Liability for the increased rate of interest is the principal difference between the settlement in the <u>Miller</u> cases, which petitioners declined when they failed to accept the piggyback agreement offer, and the settlement offer that petitioners also failed to accept.

Petitioners argue that section 6621(c) must have been an issue in the <u>Miller</u> cases since each of the decisions in <u>Miller</u> recites "That there is no increased interest due from the petitioner[s] for the taxable years [at issue] under the provisions of IRC section 6621(c)."  According to petitioners, "Surely, if the Millers were not otherwise subject to the penalty

interest provisions because of the particular timing of their tax payments, there would have been no need for the Court to include such a recital in its decisions."  This argument by petitioners is entirely conjectural and is not supported by the documentation on which counsel relies.  In fact, the recital that no increased interest under section 6621(c) was due in the Miller cases was an express term of the settlement documents in those cases and apparently included in the decisions for completeness and accuracy.  There is nothing on the record in the present cases, or in the Court's opinions in Estate of Satin v. Commissioner, supra, or Fisher v. Commissioner, supra, or in any of the material submitted to us in these cases that would indicate that the Millers were "otherwise subject to the penalty interest provisions".  Petitioners' argument is based on a false premise.

We find that petitioners and Miller were treated equally to the extent they were similarly situated, and differently to the extent they were not.  Miller foreclosed the applicability of the section 6621(c) increased rate of interest in his cases, while petitioners concede it applies in their cases.  Petitioners failed to accept a piggyback settlement offer that would have entitled them to the settlement reached in the Miller cases, and also did not enter into a settlement offer made to them prior to trial of a test case.  In contrast, Miller negotiated and

accepted an offer that was essentially the same as the Plastics Recycling project settlement offer that petitioners failed to accept prior to trial.  Petitioners' motions are not supported by the principle of equality on which they rely.  Cf. <u>Baratelli v. Commissioner</u>, T.C. Memo. 1994-484.

To reflect the foregoing,

<u>Appropriate orders will be</u>
<u>issued denying petitioners'</u>
<u>motions, and decisions will be</u>
<u>entered under Rule 155</u>.